## United Refining Company, Appellant, *v.* Jenkins.

Argued October 4, 1962. Before BELL, C. J., MUS-MANNO, JONES, COHEN, EAGEN, O'BRIEN and KEIM, JJ.

*Francis H. Patrono,* with him *Patrono and Edwards,* for appellant.

*Adolph L. Zeman,* with him *Robert L. Zeman,* and *Zeman & Zeman,* for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, March 19, 1963:

In July, 1955, a Mr. and Mrs. Nesselson (Nesselsons) owned certain land and leasehold interests in

land in Bradford, Pa., and McKean County upon which land were oil wells. Nesselsons were then having financial difficulties. The People's National Bank & Trust Company (Bank) held a first mortgage against Nesselsons' interests upon which mortgage was owing $117,388.82, the United Refining Company (United) held a $5651.30 judgment and there were other judgments totalling $8262.31, all junior in lien to the Bank's mortgage. The Bank was then threatening a foreclosure of its mortgage.

Nesselsons interested W. L. Jenkins, Jr., (Jenkins), an accountant without experience in oil production, in purchasing their interests. Jenkins contacted United and the Bank about resetting their respective loans. According to Jenkins, United's president, a Mr. Logan, (now deceased) informed him that lack of finances prevented proper operation of Nesselsons' operations, that United bought and would continue to buy their oil, that an increase in the price of oil was anticipated and that United, not an oil producer, was not interested in taking over Nesselsons' operations. After viewing Nesselsons' properties, Jenkins approached the Bank about the possibility of refinancing its loan but the Bank was not then receptive. Jenkins so informed Logan and Logan promised to use his influence with the Bank. The Bank then became receptive to the possibility of refinancing the loan and eventually made a proposal to Jenkins under which Jenkins would post $40,000 in an escrow account for improvement of the properties. Jenkins could only provide from his own funds $25,000 but he secured the promise of United to advance the additional $15,000 when needed.

In outlining the course of negotiations between the parties, certain documentary evidence is enlightening. On December 8, 1955, the Bank agreed to refinance the mortgage provided Jenkins place $50,000 for improvements of the properties in an escrow account and as-

sign to the Bank all the proceeds from the sale of oil to be used in paying the interest and principal on the mortgage and in operating costs. On December 19, the Bank modified its proposal by reducing the amount from $50,000 to $25,000 with the understanding that, when requested, Jenkins would deposit an additional $15,000. The Bank, on December 20, wrote United, enclosing a copy of its letter of December 19 to Jenkins, and requesting that United execute a letter stating that it would loan Jenkins $15,000 to be repaid *after* payment of the Bank's mortgage. On December 28 United wrote the Bank that the proposed letter was unacceptable inasmuch as it would not wait to be paid until the Bank's mortgage had been paid. On January 3, United wrote the Bank that it would loan $15,-000 to Jenkins on a note "payable to [United's] order, and at a rate [to be agreed upon between United and Jenkins] which will not interfere in any way with his obligation or commitments under the mortgage loan at [the Bank] or with the orderly development of the property until *January 1, 1958,* after which definite monthly installments of $500 will be provided for to continue to the final liquidation of the note." (emphasis supplied). On January 5, the Bank wrote Jenkins outlining the terms upon which it would refinance the mortgage; that all proceeds from the oil properties would be assigned to the Bank; after January 1, 1958, 25% of the oil proceeds would be applied to the mortgage interest and principal but, if 25% was insufficient, then as much as necessary to pay on interest and principal; the remaining 75% (if not required) would be available for payment on United's loan to Jenkins and the balance held by the Bank as further security; after August 1, 1958, 10% of the oil proceeds was to be applied to payment of mortgage interest and principal if such was adequate for the purpose; that ". . . Beginning on January 1, 1958, $500 shall be available

monthly out of 75% of the oil runs for principal payments on your note to [United] . . . ."

· United loaned $3,000 to Jenkins and received in return an unconditional $3,000 promissory note, dated June 18, 1956, payable to United's order and signed by Jenkins. On February 13, 1957, Jenkins wrote United requesting an additional $7,000 and enclosed a $10,000 promissory note (covering the original $3,000 and the additional $7,000) which note limited the recourse thereon to Jenkins' properties in McKean County. On February 20, United returned this note stating, inter alia: "However we have no particular objection to an additional $7,000 but we do object to loaning it on a note which limits payment to money that you may eventually recover from the Nesselson property . . . *in all of our discussions it has been agreed that we were to loan you money on your own signature but this is the first time the question of advancing money against the property alone has been raised."* (emphasis supplied). On February 25, Jenkins sent United a new note without any limitation as to recourse and without any protest by Jenkins as to United's understanding of the terms of the loan.

This note—the basis of United's claim against Jenkins—reads as follows:

"$10,000      Canonsburg, Pa.      February 25, 1957.

December 31, 1957 after date I promise to pay to the order of United Refining Company Ten Thousand Dollars.

Payable at United Refining Company, Warren, Pa.

Value received with interest at 5 per cent per annum.

W. L. Jenkins, Jr.      L.S.

No. . . . . . .    Due . . . . . .
Gibson 536 E.U.S. Bond."

Upon receipt of this note, United loaned an additional $7,000 to Jenkins and cancelled and returned the $3,000 note to Jenkins.

On April 1, 1957, United and Jenkins entered into a written agreement: United agreed to purchase and Jenkins agreed to sell "all the Crude Petroleum produced by [Jenkins]", the price to be "as publicly posted at [United's] office and further agrees that the said price shall be the same price as is paid by [United] to all Producers in the Bradford Field running oil into its lines"; that "[t]his agreement shall continue in full force and effect so long as there remains unpaid any indebtedness and interest thereon of [Jenkins] to [United], and thereafter from year to year unless and until either party gives to the other party at least thirty (30) days written notice of a desire to terminate the same."

Jenkins made two payments to United on the $10,-000 note: $500 on January 30, 1958 and $500 on March 3, 1958. United credited these payments to interest and principal on the note so that, on March 3, 1958, Jenkins owed United $9,586.98 on the note. No further payments were made and, although requested, Jenkins refused to make any further payments.

On November 17, 1958, United instituted an assumpsit action in the Court of Common Pleas of Washington County against Jenkins for payment of the balance owing on the note. Jenkins filed an answer containing new matter and a counterclaim. In his answer containing new matter, Jenkins admitted the execution of, the terms of, and the amount of payments made on, the note, including the amount of the unpaid balance, but *he denied that the balance of the note was then due and owing;* he averred that the *sole source* from which the note was to be paid was the proceeds from the sale of the oil, after payment of interest and principal on the Bank's mortgage and oper-

ating expenses of the properties, and that such proceeds have been unavailable to meet the obligation to United on the note. In his counterclaim, Jenkins alleged that United, in violation of its contract with Jenkins for the purchase of the oil, had cancelled the contract and, by reason thereof, Jenkins' leases and assignment of leases had been depreciated in value and rendered unmarketable to Jenkins' damage in the amount of $50,000.

After United's motion for judgment on the pleadings had been denied on the ground it was prematurely made, United filed a reply to both Jenkins' new matter and counterclaim.

The matter came on for trial before President Judge ROY I. CARSON and a jury; in United's suit against Jenkins, the jury returned a verdict in favor of Jenkins and, in Jenkins' suit against United, the jury returned a verdict in favor of Jenkins in the amount of $30,000. The court below refused United's motions for judgment n.o.v. and a new trial. From judgments entered on the verdicts United has appealed.

## United v. Jenkins

In seeking a judgment n.o.v., United contends that parol evidence should not have been admitted in an attempt to prove that the sole source of payment of the note given by Jenkins to United was the proceeds of the oil from the properties and that, without such parol evidence, United was entitled to a directed verdict in its favor.

On its face, this note is unconditional. An examination of the note clearly and unequivocally reveals that Jenkins promised to pay United after December 31, 1957, *without qualification or condition.* By the introduction of parol evidence, Jenkins sought to add a qualification and condition to his promise to pay,

i.e., that payment of the note was to be made *only* from the proceeds of the sale of oil, and until such proceeds were available, the note did not become due and payable.

It is Jenkins' contention that "the note was not a single, separate integrated transaction, but rather was part and parcel of one entire transaction, which began in August of 1955, as appears from other instruments in writing, and the oral testimony produced at the trial of the case" and that there are *two* instruments involved, i.e., the so-called "basic" agreement between the Bank and Jenkins and the note and, without the information supplied by the "basic" agreement, the note is incomplete. Such contention is completely without merit. To the so-called "basic" agreement between the Bank and Jenkins United was not a party, eo nomine or otherwise; the Bank-Jenkins agreement simply *permitted* and *allowed* Jenkins to utilize a certain excess portion of the proceeds of the sale of oil—otherwise payable on the Bank's mortgage and for development purposes—toward payment of Jenkins' obligation to United but in no manner does it, nor could it, bind United to look only to that source for payment of the note; this note is complete on its face and does not require the Banks-Jenkins agreement to complete it. The court below permitted the jury to determine whether the note, the Bank's mortgage and the agreement of United to purchase Jenkins' oil[1] constituted an *integrated* contract and, in this respect, the court clearly erred. The facts do not show any integration[2] and, in any circumstance, the question of integration was for the court, not a jury, to determine: *Gianni v. Rus-*

---

[1] Executed a month *after* the execution of the note.

[2] *Neville v. Scott*, 182 Pa. Superior Ct. 448, 127 A. 2d 755; *Wilson v. Viking Corp.*, 134 Pa. Superior Ct. 153, 3 A. 2d 180; and *Landreth v. First National Bank of Phila.*, 346 Pa. 551, 31 A. 2d 161, relied on by Jenkins, are clearly inapposite.

*sell & Co., Inc.,* 281 Pa. 320, 324, 126 A. 791; *O'Brien et al. v. O'Brien,* 362 Pa. 66, 71, 66 A. 2d 309.

The rule enunciated in *Gianni v. Russell & Co., Inc.,* supra, is firmly embedded in the law of Pennsylvania and from that rule we will not permit a deviation for it is essential that the integrity of written contracts be maintained. In *Grubb v. Rockey,* 366 Pa. 592, 597, 79 A. 2d 255, we said: "The modern Pennsylvania Parol Evidence Rule is well stated by Mr. Justice STEARNE in Walker v. Saricks, 360 Pa. 594, 598, 63 A. 2d 9: 'This Court said in Gianni v. R. Russell & Co., Inc., 281 Pa. 320, 323, 126 A. 791: "Where parties, without any fraud or mistake, have deliberately put their engagements in writing, *the law declares the writing to be not only the best, but the only, evidence* of their agreement: [citing cases]. *All preliminary negotiations, conversations and verbal agreements are merged in and superseded by the subsequent written contract* . . . and unless fraud, accident or mistake be **averred,** *the writing* constitutes the agreement between the parties, *and its terms cannot be added to nor subtracted from by parol evidence*: [citing cases]." ' " See also: *O'Brien et al. v. O'Brien,* supra; *Bokser v. Lewis,* 383 Pa. 507, 119 A. 2d 67; *Keleher v. LaSalle College,* 394 Pa. 545, 147 A. 2d 835.

The case at bar is controlled by *Speier v. Michelson,* 303 Pa. 66, 70, 71, 154 A. 127, wherein this Court said: "The note in suit presents an unqualified promise to pay to a designated person, at a particular time, a given amount of money. The contract is absolute and complete on its face, and sufficiently comprehensive to embody the aim and object of the parties. They selected a negotiable note as the means best adapted to express their respective relations to each other. When they did this, they intended it to embrace all the essential features that enter into such writing, otherwise they would have resorted to a different form of

instrument. May the maker now be permitted to reduce the effective character of such instrument by an outside agreement effecting any material part of it? *Here a particular fund or a certain property is set up as the source from which payment is to be made.* In answering this question we hold that, unless there was fraud, accident, or mistake in omitting the agreement from the writing, the character of the instrument will not be ignored but will be given its normal effect and will control." (emphasis supplied). See also: *Hacker v. National Oil Refining Co.,* 73 Pa. 93; *Heist v. Hart,* 73 Pa. 286; *Fuller v. Law,* 207 Pa. 101, 56 A. 333; *Homewood People's Bank v. Heckert,* 207 Pa. 231, 56 A. 431. *Allinger v. Melvin,* 315 Pa. 298, 172 A. 712, and *Boyd Estate,* 394 Pa. 225, 146 A. 2d 816, relied upon by Jenkins, are not apposite: in both *Allinger* and *Boyd* there was an admission that the whole of the agreement had not been set forth in the written agreement.

By the introduction of parol evidence Jenkins sought not to alter or modify this note but rather to destroy it: *Speier,* supra. The court below should not have permitted the introduction of parol evidence to affect the terms of this note, complete on its face, in the absence of any averment of fraud, accident or mistake. Without such parol evidence, the record clearly shows that United was entitled to a verdict against Jenkins and the court below should have so directed. Not having done so, the court erred.

### Jenkins v. United

United seeks the entry of judgment n.o.v. upon the grounds that Jenkins' counterclaim does not set forth a cause of action and the evidence at trial failed to do so. United's contentions are three-fold: (a) that Jenkins, not United, breached the so-called crude oil pur-

chase agreement which is the basis of Jenkins' cause of action; (b) that, even if United did breach the agreement, Jenkins suffered no provable loss; (c) that, even if United breached the agreement, the damages sought to be proved by Jenkins are not recognized at law.

The basis upon which Jenkins seeks a recovery against United in his counterclaim is the so-called crude oil purchase agreement of April 1, 1957 under which United agreed to purchase and Jenkins agreed to sell all the crude oil produced by Jenkins. So far as herein pertinent, this agreement was to continue *"so long as there remains unpaid any indebtedness and interest thereon of [Jenkins] to [United] . . . ."* On March 19, 1958, this agreement was cancelled by United upon the ground that Jenkins had defaulted in payment of his indebtedness to United.

Initially, we inquire whether United, by its cancellation notice of March 19, 1958, committed a breach of its agreement with Jenkins because, if United did not breach this agreement, Jenkins has no cause of action. Resolution of that inquiry depends upon an interpretation and construction of the meaning of the language "so long as there remains unpaid any indebtedness" to United by Jenkins.

Jenkins' interpretation of this clause of the agreement is that as long as Jenkins owed United an indebtedness, regardless of whether Jenkins was in *default* in paying this indebtedness, the agreement continues in full force and effect. In his brief, Jenkins makes clear this position: "In any event, what difference does it make whether Jenkins defaulted or did not default? The agreement does not contain any language predicated on a default. . . . even if there were a default, the fact remains that the indebtedness was unpaid."

At the time this agreement was executed, Jenkins was obligated to United for $10,000 represented by the note of February 25, 1957.[3] At the time of entry into this agreement United's purposes are clear: to aid Jenkins in securing a market for the oil, to secure oil for its own purposes and to enable Jenkins to make a profit.

In submitting this issue to the jury, the court below did so upon the theory that, if Jenkins' note to United was to be paid only from the "oil runs", Jenkins would not be in default in his obligations on the note to United and, therefore, United breached the contract and, *apparently* from its verdict, the jury must have so found. In its opinion, the court below, in construction of the language of the agreement, stated: "The agreement does not contain any language predicated on a default. It [the agreement] is specific in its terms that it 'was to continue so long as there remains any unpaid indebtedness and interest thereon", *so even if there were a default the fact remains that the indebtedness was unpaid.*" (emphasis supplied). It is obvious that the theory on which the court proceeded was erroneous in two respects; in its premise that the note could, by parol evidence, be altered as to its source of payment and in its premise that, even if a default on Jenkins' part had occurred, such default would not justify a cancellation of the agreement.

In the construction of any contract, certain principles must guide us: (a) if there is any doubt as to the meaning of a term of a contract, such term should "receive a reasonable construction and one that will accord with the intention of the parties; and, in order to ascertain their intention, the court must look at the circumstances under which the [contract] was

---

[3] There was also a judgment in the amount of $5651.30 held by United against the properties.

made": *Connery v. Brooke,* 73 Pa. 80, 83, 84; *Hindman v. Farren,* 353 Pa. 33, 35, 44 A. 2d 441; *Hild v. Dunn,* 310 Pa. 289, 293, 165 A. 228; *Hempfield Twp. School District v. Cavalier,* 309 Pa. 460, 464, 465, 164 A. 602; (b) in construing a contract we seek to ascertain what the parties intended and, in so doing, we consider the circumstances, the situation of the parties, the objects they have in mind and the nature of the subject matter of the contract: *Percy A. Brown & Co. v. Raub,* 357 Pa. 271, 287, 54 A. 2d 35; *Slonaker v. P. G. Publishing Co.,* 338 Pa. 292, 296, 13 A. 2d 48; (c) "However broad may be the apparent terms of the agreement, it extends only to those things concerning which the parties intended to contract, and the subject-matter of their negotiations may affect the meaning of the words they employ, *especially* if, in connection with that subject-matter, *the conventional interpretation would give an unreasonable or absurd result*": (emphasis supplied). *McCormack v. Jermyn,* 351 Pa. 161, 167, 40 A. 2d 477. See also: *Heidt v. Aughenbaugh Coal Co.,* 406 Pa. 188, 192, 176 A. 2d 400; *Mowry v. McWherter,* 365 Pa. 232, 238, 74 A. 2d 154; *Percy A. Brown & Co. v. Raub,* 287, supra; *Reilly v. City Deposit Bank & Trust Co.,* 322 Pa. 577, 582, 185 A. 620; *Hempfield Twp. School District v. Cavalier,* 309 Pa. 460, 164 A. 602; *Tudesco et ux. v. Wilson,* 163 Pa. Superior Ct. 352, 357, 60 A. 2d 388.

In the case at bar, it is clear: that Jenkins, under obligation both to the Bank and United, desired a regular market for the oil which he produced; that United, interested in obtaining a supply of oil and in enabling Jenkins to honor his obligation to United, was willing to purchase all Jenkins' oil; that both United's president and Jenkins were experienced business men; that United was willing to continue purchasing all Jenkins' oil so long as Jenkins honored his obligations to United. However, if Jenkins' conten-

tion is correct, United was bound to continue purchasing all Jenkins' oil, (the proceeds of which were paid over to the Bank), even though Jenkins failed to honor his obligation to United and Jenkins could continue to default in his obligation to United and United would still be bound. Such an interpretation of the language of this contract is both absurd and unreasonable. Under such an interpretation, Jenkins could take his profits from the "oil runs", dishonor his obligations to United and United would be bound indefinitely to the agreement.

Considering all the circumstances, the only sensible and reasonable interpretation of this agreement is that United was bound by its terms so long as Jenkins was indebted to it *and had not defaulted in his obligations*. Once a default occurred, United had the right to cancel this agreement. Under our construction of the language of this contract, United, by its cancellation, did not commit a breach of the agreement for at that time Jenkins was in default in his payments to United. United not having committed a breach of the agreement, Jenkins has no cause of action against United and the court below should have directed a verdict in favor of United.

In view of the conclusion reached, we need not consider United's other reasons for judgment n.o.v. or its reasons for a new trial.

Judgments reversed with the direction that judgments n.o.v. be entered in United's suit against Jenkins and Jenkins' suit against United.