## Stranahan v. Jennings

*Robert M. Landis* and *William P. Manning, Jr.,* for plaintiff.

*Edward H. Fackenthal,* for defendant.

SMILLIE, J., December 8, 1972.—After trial on a suit involving a contract, the jury awarded the plain-

tiff, Frank R. Stranahan, $221,112. Motions for judgment n. o. v. and for a new trial were argued before the court en banc consisting of David E. Groshens, P. J., Frederick B. Smillie, J., and Robert W. Tredinnick, J. Defendant argued only for a new trial and not for judgment n. o. v.

In considering the motion for a new trial, the court has reviewed the evidence in the light most favorable to the verdict winner and has given such winner the benefit of all reasonable inferences that may be fairly drawn: Donnelly & Suess, Inc. v. Lilley, 393 Pa. 32 (1958).

By agreement dated December 5, 1961, Frank Stranahan was admitted to the firm of Jennings, Mandel and Longstreth as a limited partner. Under the agreement, Stranahan was to contribute and maintain in his capital account securities with a market value of $1,800,000, which Stranahan did, including therein 50,000 shares of Champion Spark Plug common stock. According to the agreement, Stranahan could at any time substitute cash or securities of equal value for the stock so contributed.

During the course of 1962, the firm experienced financial difficulties. In May, 1962, the general partners, Warner, Jennings, Mandel and Longstreth, were suspended from the firm by the New York Stock Exchange. The suspended partners were forbidden to deal with the public. The firm had a shortage of capital; its bank credit had been curtailed. The New York Stock Exchange demanded that the firm obtain additional capital.

In April, 1962, the general partners met with Stranahan and Shelton F. Claar, Stranahan's personal investment manager, to request an additional contribution from Stranahan. The partners felt that if they could obtain the additional capital from Stranahan the firm

might be able to weather the storm of financial crisis. The contribution of Stranahan in response to such request took the form of the net proceeds from securities as evidenced in plaintiff's exhibit P9-D.

On December 28, 1962, Stranahan entered into an agreement with John E. Jennings to fix the terms of Jennings' repayment to Stranahan of Jennings' share of the firm's losses. The relevant provisions of the agreement are as follows:

"(3) Jennings shall pay to Stranahan the sum of $150,000 in 25 successive installments, as follows: the sum of $3000 on or before the 1st day of May in each of the years 1964, 1965 and 1966;

" . . .

"Upon Jennings' failure to make the payment of any installment set forth above . . . *all of the obligations, direct or contingent, of Jennings to Stranahan shall become due and payable immediately,* without notice or demand.

" . . .

"(5) Notwithstanding any of the provisions of paragraph 3 and 4 hereof:

" . . .

"D. If and when 'the total losses sustained by Stranahan as a result of his membership in the Firm' shall have been reduced to $1,000,000, Jennings shall be relieved of any further obligations to Stranahan pursuant to paragraphs 3 and 4 hereof. For the purposes of this agreement, 'the total losses sustained by Stranahan as a result of his membership in the Firm' shall be calculated by adding to all payments made by Stranahan to or for the benefit of the Firm (including, but not limited to, all payments made by Stranahan to creditors of the Firm), all expenses incurred by Stranahan in connection with the liquidation of the Firm and the outstanding amount of obliga-

tions to creditors of the Firm assumed by Stranahan upon liquidation of the Firm and subtracting from the sum thereof all payments made to Stranahan by Jennings and/or other general partners of the Firm and the net proceeds of the sale by Stranahan of any securities or other property received by him upon the liquidation of the Firm.

"(6) *Jennings agrees that as of the date first above written (i.e., December 28, 1962) the Firm shall be dissolved and liquidated and that all of the Firm's assets shall be distributed to Stranahan upon his assumption of all of the remaining liabilities of the Firm. . . ."* (Italics supplied.)

On June 28, 1962, Stranahan agreed to his role in bringing about the orderly liquidation of the firm.

In the motion for a new trial, defendant contends that the court committed error:

1. In admitting exhibits P-9A through P-9D and P-10 introduced into evidence by plaintiff through the main financial manager, Shelton F. Claar.

Exhibit P9-A incorporates the total of P9-B through D, less the total obligations of the partners to Stranahan upon their *individual* reimbursement agreements.

Exhibit P9-B was a list of checks from Stranahan's bank accounts to or for Jennings, Mandel and Longstreth. (The original checks were in court and made available to defendant. Claar actually drew the checks and signed them on behalf of Stranahan.)

Exhibit P9-C reflected the obligations owed by the partnership to various banks as of December 28, 1962. Claar had personal charge of negotiating with the various banks listed and had entered into agreements with them for the repayment of the obligations outstanding. It does not include the interest on the various loans.

Exhibit P9-D reflected net proceeds of securities

contributed by Stranahan as a result of the April, 1962, meeting of the general partners with him. Claar was present at the meeting. The securities listed in P9-D had been sold by the partnership prior to liquidation and used for its benefit.

Exhibit P9-10 was prepared by Claar, together with Arthur Young and Company in January, 1971, from Stranahan's income tax returns and contains:

(a) a summary of exhibits P9-A through P9-E;

(b) costs of settling a law suit against the firm;

(c) interest on bank obligations and other expenses from 1963 through 1969 which Claar had paid or authorized the payment of;

(d) receivables collected from the partners under their individual agreements with Stranahan; and

(e) proceeds from the sale of individually itemized securities.

2. In permitting the jury to interpret the intent of the ambiguous agreement as to paragraph 5D of the agreement, providing:

"D. If and when 'the total losses sustained by Stranahan as a result of his membership in the Firm' shall have been reduced to $1,000,000, Jennings shall be relieved of any further obligations to Stranahan pursuant to paragraphs 3 and 4 hereof. For the purposes of this agreement, 'the total losses sustained by Stranahan as a result of his membership in the Firm' shall be calculated by adding to all payments made by Stranahan to or for the benefit of the Firm (including, but not limited to, all payments made by Stranahan to creditors of the Firm), all expenses incurred by Stranahan in connection with the liquidation of the Firm and the outstanding amount of obligations to creditors of the Firm assumed by Stranahan upon liquidation of the Firm and subtracting from the sum thereof all payments made to Stranahan by Jennings

and/or other general partners of the Firm and the net proceeds of the sale by Stranahan of any securities or other property received by him upon the liquidation of the Firm"; and

3. In refusing to allow defendant's expert to *testify* as to *his* opinion that exhibits D4 through D6 contradicted exhibits P9-A through P9-D and P-10.

In January, 1963, Claar, together with Arthur Young and Company, an accounting firm, prepared summaries of Stranahan's various contributions to the firm as of that date. These summaries were introduced into evidence over defendant's objections as exhibits P9-A through P9-D.

Shelton F. Claar, Stranahan's personal investment manager, was sent in as Stranahan's personal representative to supervise the orderly liquidation of the firm in June, 1962, when Stranahan assumed the role of liquidating partner. At first, Claar was unaware of the exact financial condition of the firm and requested the preparation of trial balances by James A. Riley, a general partner in charge of backroom (bookkeeping) operations and later from Martin Longstreth, another general partner. Claar did not personally supervise the preparation of these statements nor was he then or is he now capable of speaking for their accuracy.

"BY MR. FACKENTHAL:

"(Claar) A This is a document a statement of financial condition for Jennings, Mandel and Longstreth that was prepared by either Mr. Riley or Mr. Longstreth *at the time I came in to start liquidation* of the firm. (Italics supplied.)

". . .

"BY THE COURT:

"Q Mr. Claar, did you prepare or was it prepared under your supervision, the balance sheet of July 17, 1962, which you now have before you?

"A Your Honor, I did not prepare it and during that month of July I was trying to get information as to the status of the firm and that was prepared at my request *by the accountant.*

". . .

"BY MR. FACKENTHAL:

"Q Can you pinpoint when you can speak for the accuracy of the balance sheets?

"A *I can never speak for the accuracy of the balance sheets because they do not include Mr. Stranahan's total contributions.*

*These reflected items that flowed through the books.*" (Italics supplied.)

As time progressed and his familiarity with the financial condition of the firm increased, Claar realized that the firm had liabilities of at least $2,000,000 in excess of its assets.

The best evidence rule provides that in proving the terms of a writing, where such terms are material, the original writing must be produced and that *if proof of facts* is sought to be made by showing the contents of the books and records, the original must be produced. However, *where the issue is not the contents of the writing* and the facts recorded in the writing exist *independently of the books* in which they are recorded, the rule does not apply and the issue may be proved by either oral or written testimony on the facts: Mars v. Meadville Telephone Co., 344 Pa. 29 (1942); Perry v. Ryback, 302 Pa. 559 (1931); Cupples v. Yearick, 99 Pa. Superior Ct. 269 (1930).

In Mars v. Meadville Telephone Co., supra, plaintiff-wife, in a wrongful death action, sought to testify from her own personal knowledge as to the amounts of her husband's earnings without first accounting for the nonproduction of his record books. The court held that the best evidence rule does not apply when *the issue*

*is not the contents of the books but the amount* of decedent's earnings.

In the instant case, P9-A through P9-D were prepared by Claar, Stranahan's investment manager, who had personal knowledge of all the transactions evidenced by the summaries and was instrumental in their preparation.

Stranahan did not seek to prove his losses in the firm *by proof of the contents* of the partnership books.

The formula set forth in the agreement which details the method of computation does not require the computation of Stranahan's losses on the basis of the partnership books.

The elements of the formula, i.e., payments made by Stranahan to or for the benefit of the firm, the expenses of liquidation, the amount of obligations owed to creditors, the payments of Jennings and/or other partners and the net proceeds of the sale of securities by Stranahan, are *facts* which exist *independently* of the partnership records, if, in fact, they even appear on the records at all.

Furthermore, defendant's objection to Exhibits P9-A through P9-D and P-10 is not based on the evidence which they depict of what Stranahan, in fact, paid into the firm. Defendant's *objection* relates *solely* to the failure of these exhibits to show the amount of *income* generated by the firm. The issue of plaintiff's suit, however, is not the firm's *income*, but the *losses* of Stranahan as set forth in the agreement between Stranahan and Jennings. The wisdom or necessity of Stranahan's contributions to the firm is a matter distinct from the actual amount of such contributions.

Defendant further contends that the trial judge erred in submitting to the jury the question of the date intended for calculation of Stranahan's losses under paragraph 5D of the agreement with Jennings.

Both parties agree that there is a contract. It is only the intention in paragraph 5D upon which the principal disagreement exists.

To repeat, paragraph 5D of the agreement between Stranahan and Jennings provides:

"D. If and when 'the total losses sustained by Stranahan as a result of his membership in the Firm' shall have been reduced to $1,000,000, Jennings shall be relieved of any further obligations to Stranahan pursuant to paragraphs 3 and 4 hereof. For the purposes of this agreement 'the total losses sustained by Stranahan as a result of his membership in the Firm' shall be calculated by adding to all payments made by Stranahan to or for the benefit of the Firm (including, but not limited to, all payments made by Stranahan to creditors of the Firm), all expenses incurred by Stranahan in connection with the liquidation of the Firm and the outstanding amount of obligations to creditors of the Firm assumed by Stranahan upon liquidation of the Firm and subtracting from the sum thereof all payments made to Stranahan by Jennings and/or other general partners of the Firm and the net proceeds of the sale by Stranahan of any securities or other property received by him upon the liquidation of the Firm."

The agreement specifically provides *the date* when reimbursement payments to Stranahan are to *commence*. It nowhere or by any possible inference provides a time as to when Stranahan's *losses are to be calculated,* not even in the so-called relief clause 5D. Paragraph 5D merely says "if and when" the *losses* are reduced to one million dollars, then Jennings is relieved of his obligation. Nothing about income; nothing about recoveries; only and solely the losses of Stranahan.

Plaintiff contends that 5D provides a date when an

installment is due and unpaid, that is, whether the losses of Stranahan are, *at that time,* in excess of one million dollars. Such date was May 1, 1964.

Defendant, on the other hand, contends that no money of any amount is due to Stranahan *because some* of the Champion Spark Plug stock had not yet been sold. Defendant maintains that all the securities had to be sold and accounted for even if it occurred in some infinite, indefinite future. He contends the firm's assets had to be completely liquidated at some undetermined, unstated, unpredictable, future date before he, Jennings, owed Stranahan anything at all.

The intention of the parties is to be ascertained from the entire instrument and from language used, when clearly expressed: East Crossroads Center, Inc. v. Mellon-Stuart Co., 416 Pa. 229 (1965). However, where the intention of the parties is not clearly expressed in the agreement and the words used give rise to ambiguity or doubt, resort may be had to the surrounding circumstances: United Refining Co. v. Jenkins, 410 Pa. 126 (1963).

In Lever v. Lagomarsino, 282 Pa. 110 (1925), plaintiff brought an action in assumpsit to recover for work alleged not to be covered by the contract. The court there stated that: "Where there is uncertainty as to what specifications are covered by a written contract, it may be explained by parol evidence and *then becomes a question for the jury"*: Framlau Corp. v. Upper Dublin School Authority Board, 219 Pa. Superior Ct. 369 (1971). (Italics supplied.)

In the instant case, a substantial dispute existed as to the date for calculating Stranahan's losses. The language of 5D when taken together with the other provisions of the contract, particularly paragraphs 3 and 6, creates uncertainty as to the meaning and intent of the contracting parties.

The agreement was obviously and admittedly ambiguous.

The jury was instructed that it could find the relevant date for the calculation of losses under 5D of the agreement as either:

(1) December 28, 1962, *the date of the agreement;* or

(2) May 1, 1964, the date *when the first installment was due* and unpaid; or

(3) the date when all the securities were sold if, in fact, they were ever sold.

Paragraph 5D purports to help Jennings in the event that the disaster to the partnership was not as great as feared. Installment payments were due from Jennings beginning on May 1, 1964, if, by that date, *the losses* of Stranahan had been reduced to $1,000,000. May 1, 1964, would appear to be a tenable date for the calculation of Stranahan's losses, particularly since the installments were to begin on that date. Is it not logical and practical to argue that an agreement providing specifically to pay a sum as certain as $150,000 beginning with installments on May 1, 1964, that that was the date that Jennings' obligations to Stranahan were to be calculated? The "relief," if any, would, of necessity, have to occur before or by that date.

The letters from plaintiff's investment manager to defendant demanding payment both before and after May 1, 1964, as well as the $600 paid by Jennings on account of the agreement, indicates the calculation of losses was intended by the parties to be *before all* the assets were sold. One cannot lose sight of the fact that paragraph 6 of the agreement provides the firm is *dissolved* and *liquidated* as of December 28, 1962, the date of the agreement.

The agreement is badly drawn. All the lawyers agree to that fact and it requires no Solomon to confirm such

inescapable conclusion. It is loosely and confusedly written at best, but from its four corners, the obvious intention of the parties can be obtained.

The circumstances of the reason for the agreement should also be considered. Jennings was desperate for funds. He was not only in financial trouble with the firm of which he was senior partner, but his income as a broker was endangered by his suspension by the Stock Exchange. The Santa Claus he envisioned was Stranahan. Stranahan agreed, but insisted upon an agreement which Jennings was only too happy to execute. The agreement was drawn by New York lawyers. It reads as if it had been hastily drawn but the overwhelming impression obtained from it was that if Stranahan was foolish enough to take over what appeared to be a colossal loss, he, Jennings, was willing to guarantee a contribution of $150,000 if the loss of Stranahan was $1,000,000 or more. Everyone, of course, at that stage thought the loss would be far in excess of that figure. Jennings' contribution, with his other partners on separate agreements, was a drop in the bucket insofar as the total expected financial loss was concerned. But the ways of "mice and men gang aft a-gley," as the poet Burns wrote, and Stranahan was more than a Santa Claus; he was lucky or financially shrewd, or both, because the stock market changed and so did the future of Stranahan. Jennings did not contemplate Stranahan being able to come out whole, much less profit from his venture. All partners considered the financial debacle a lost cause. Jennings made only a part of the installment due which seemed to be in keeping with his past financial dealings.

On December 28, 1962, the liquidation agreement date, Stranahan acquired all the assets of the firm.

December 28, 1962, is *also* a logical date for the cal-

culation of Stranahan's losses, not only because it is the effective date of the liquidation agreement, but also because it positively and unequivocably states that December 28, 1962, shall be the date of liquidation.

Since paragraph 5D, taken together with the rest of the contract, could refer equally to any one of the three dates mentioned, the meaning is ambiguous and was properly left to the jury.

Defendant introduced into evidence certain trial balances (D4 through D6) which had been prepared by Charles Boyle, bookkeeper for the firm since 1962. The trial balances were for the years 1967, 1969 and 1970, respectively. Boyle testified that he had, in preparing his first trial balance, copied the entries from the records of the partnership and that he had merely carried the entries forward from year to year unless someone told him that the asset was no longer held or he ascertained such information from the partnership checking account.

Defendant sought to have Francis J. Rainer, an accountant *who had no personal knowledge of the partnership's affairs,* explain to the jury that *defendant's exhibits* D4 through D6 *contradicted plaintiff's exhibits* P9 and P10. Defendant said his purpose was to impeach plaintiff's exhibits P9 and P10 by Rainer's expert testimony. It was refused. The refusal is one of defendant's reasons for a new trial.

Claar, plaintiff's investment manager, had testified that the trial balances, though made at his direction, were not made under his supervision and that he could not speak for their accuracy. From Boyle's testimony, there is no indication that the trial balances were made under plaintiff's personal supervision.

At trial, the determination of whether expert testimony should be accepted in any given situation is generally within the discretion of the trial judge: Weis-

man v. Sauder Chevrolet Co., 402 Pa. 272 (1961); Phila. to use v. Neill and Lincoln Saving and Trust Co., 211 Pa. 353 (1905).

To guide the trial judge in the exercise of his discretion, the Supreme Court has stated:

" 'A qualified expert may be permitted to assert a relevant fact *not generally known* but known to him because of his special training and experience. But this special training and experience must be confined to technical knowledge which is beyond that of the average man and to that which would be of assistance in determining the ultimate issues in the case': Steele v. Shepperd, 411 Pa. 481, 484, 192 A. 2d 397 (1963). If all the primary facts can be accurately described to a jury and if the jury is as capable of comprehending and understanding such facts and drawing correct conclusions from them as are witnesses possessed of special training, experience or observation, then there is no need for the testimony of an expert": Reardon v. Meehan, 424 Pa. 460 (1967). (Italics supplied.)

It is obvious that the expert Rainer could only say in *his* opinion the exhibits were contradictory. Such is argument. It could and was vigorously stated to the jury by able counsel for the defendant. It was not properly *expert* testimony. It would serve only to expound defendant's theory of the case by argumentative opinion. Plaintiff could then call his expert to contradict defendant's expert and so on ad infinitum. It was obviously a matter for counsel to argue which defendant's counsel did most persuasively and eloquently to the jury.

To allow testimony concerning an expert's opinion of an accounting procedure, beyond the face of the exhibits, would be to mislead the jury from the main issues in the case and enmesh them in arguments unessential to a determination of the facts.

Defendant also contends that his expert should have

been permitted to qualify and explain the $2,000,000 tax loss for 1962 testified to by Martin Longstreth. Such testimony would have led to the senseless pursuit of collateral matters in an already complex trial. If the return had been offered into evidence there would have been no need for expert testimony since the return would speak for itself.

The trial was excellently conducted by unusually able counsel for both plaintiff and defendant. No argument or facet of the case was left unexplained unless it was to publicly censor the New York author of the agreement. Such, too, would have accomplished nothing because the agreement was obviously a life preserver much needed by Jennings and his other partners to survive. It probably was urged in haste by Jennings. Fate and financial winds changed the expected course of events. Jennings should not complain and he would not have done so in December, 1962.

### ORDER

And now, December 8, 1972, after argument before the court en banc, consisting of David E. Groshens, P.J., Frederick B. Smillie, J., and Robert W. Tredinnick, J., for the reasons set forth above, defendant's motion for a new trial is dismissed.