William SHERMAN, Plaintiff,

v.

MEDICINE SHOPPE INTERNATION-AL, INC., Defendant.

MEDICINE SHOPPE INTERNATION-AL, INC., Plaintiff,

v.

William SHERMAN, et al., Defendants.

Nos. 79–1351, 83–1965.

United States District Court,
E.D. Pennsylvania.

Feb. 24, 1984.

William Atlee, Jr., Lancaster, Pa., for William Sherman.

Ronald J. Shaffer, Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., Stephen H. Rovak, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., for Medicine Shoppe.

## MEMORANDUM AND ORDER

TROUTMAN, Senior District Judge.

This matter is before the Court on Medicine Shoppe International, Inc.'s ("MSI"), Second Motion to Reopen and Enforce Settlement Agreement, and for Summary Judgment in Accordance with Settlement, and the Motion Requesting Equitable Recision of a Portion of Settlement Agreement filed by plaintiff in Cause No. 79–1351 and all defendants in Cause No. 83–1965 (such parties hereinafter being referred to collectively as "Sherman"). For the reasons set forth below, MSI's motion will be granted, and Sherman's motion will be denied. Because of the complexity of the situation, the facts and legal positions of the parties have been analyzed at some length.

### I.

### THE FIRST SETTLEMENT

In 1979, William P. Sherman filed Civil Action 79–1351 in the state courts of Pennsylvania. The case was subsequently removed to this Court and a counterclaim was filed by MSI. Sherman alleged, *inter alia,* various breaches of two license agreements between himself and MSI, pursuant to which MSI licensed Sherman to utilize MSI's trademark, tradename and methods of doing business in the operation of two apothecary-type pharmacies (one in Reading, the other in Lancaster). MSI, in its counterclaim in Civil Action 79–1351 and its complaint in Civil Action No. 83–1965, sought enforcement of those license agreements and, in particular, the termination provisions contained in them.

Civil Action No. 79–1351 was called for trial on the morning of June 21, 1983. Prior to the case actually commencing, the parties reached a settlement (the "First Settlement") resolving all issues in both cases. The First Settlement was reached after lengthy negotiations, at which all parties were represented by counsel. Its terms were read to the Court, but the Court's reporter was not in attendance. Despite several attempts by MSI to make a formal record of the agreement, that was impossible. In any event, all parties agreed that the essence of the first settlement was the payment of $110,000 by Sherman to MSI, and MSI's purchase of a pharmacy in Reading, PA, (the "Pharmacy") from Sherman, generally along the lines called for in the termination provisions of the License Agreements.

On June 23, 1983, MSI's counsel ("Rovak") sent a letter (the "Letter") setting out the terms of the First Settlement to William Atlee, Jr., counsel for Sherman. The Letter correctly recorded the terms of the First Settlement, including a proviso that although the parties intended to execute a formal agreement, the First Settlement was a full settlement agreement in and of itself.

On June 24, 1983, Atlee wrote Rovak, and although raising a procedural point, stated that the Letter "sets forth most of the essential terms" pertaining to the First Settlement. Rovak called Atlee to discuss the procedural point raised by Atlee, at which time Atlee confirmed that there were no essential terms of the First Settlement not accurately set out in the Letter. Rovak next sent Atlee an agreement, and related documents which were intended to be formalized documentation of the First Settlement (the "Rovak Agreement"). These documents did not vary any essential term

of the agreement, and merely contained standard wording, so-called "boilerplate", of a contract to sell a small business.

On August 9, 1983, an attorney in Atlee's firm notified Rovak that the Rovak Agreement had not been yet reviewed. Rovak became concerned and wrote Atlee stating that while changes in formal wording were of no consequence to MSI, MSI would not accept any substantive renegotiation of the First Settlement. Nonetheless, on August 26, 1983, Atlee sent a revised set of settlement documents to Rovak. Those documents were materially different from the First Settlement of June 21, 1983. Upon their receipt, Rovak contacted Atlee and again told him that while MSI would stand by the terms of the First Settlement it was not concerned about formal wording, and would even accept Atlee's version if the substantive terms conformed to the First Settlement.

In the meantime, MSI had relied upon the First Settlement by contracting to sell the Pharmacy to a Mr. Naglak, under a new license agreement.

However, Sherman refused to conclude the First Settlement. When MSI sought to enforce that settlement, Sherman responded by pointing out differences between the Rovak Agreement and the version sent by Atlee, as proof that no binding agreement had ever been reached. The recitation was irrelevant, for the issue before the Court was not whether or not the documents sent by Rovak or Atlee signified an inability to reach an agreement, but whether the First Settlement was in and of itself binding upon the parties. This Court spent the 29th and 30th of September, 1983 hearing testimony on MSI's first motion, and Sherman's response, during which time Rovak, Atlee, William Sherman, and Ronald T. Hofmeister, an executive of MSI, all testified as to the terms of the First Settlement. After the evidence had been closed, but before the Court reached any decision, the parties announced that they had once again reached a settlement. It is this second settlement that MSI seeks to enforce, and which Sherman seeks to partially rescind.

## II.

### THE SECOND SETTLEMENT

The First Settlement contained *inter alia*, a provision whereby Sherman would lease the real estate upon which the Pharmacy sits to MSI. At the hearing of the 29th and 30th of September, it was obvious that most of Sherman's unhappiness over the First Settlement revolved around the fact that the lease called for in that agreement was unsatisfactory both to William T. Sherman and a business associate, Mr. Thomas Frontz. In particular, Mr. Sherman felt that the terms of the lease described in the First Settlement were such as to make a subsequent sale of the real estate difficult. Mr. Sherman also thought that under the First Settlement, the leasing of the property in question could be accomplished on the terms called for in the lease between Royer Pharmacy, Inc. (a corporation controlled by Sherman) and Madeline Lipman, pursuant to which Royer Pharmacy, Inc. leased certain property from Madeline Lipman beginning in 1974 (the "Lipman Lease"). Sherman also objected to other terms in the First Settlement.

Late on September 30th, Atlee approached Rovak and asked if MSI would agree to alter the First Settlement in accordance with Sherman's wishes, which Atlee listed, and if so, what the cost to Sherman would be. Atlee and Rovak then negotiated over this cost, and over changes Sherman wanted to make in the First Settlement. As a way to structure the proposed settlement, Atlee began by utilizing still another form of agreement. This one was a document he had sent to Rovak in an effort to settle the matters raised in MSI's first motion. This form had been prepared by Dennis Ward, another attorney for Sherman and has been referred to as the "Ward Agreement".

Rovak refused to use the Ward Agreement, insisting instead upon the use of the Rovak Agreement. Atlee then agreed to utilize the Rovak Agreement, but wanted to incorporate certain terms of the Ward

Agreement into the Rovak Agreement, and make other changes as well. A number of provisions of the Ward Agreement were in fact incorporated into the Rovak Agreement, and in most cases the incorporation was verbatim. Included among these were terminology for evaluating the inventory to be purchased by MSI, language with respect to the copying of accounts receivable data by the sellers, a description of certain litigation to which Sherman was a party, language on warranties and representations, language with respect to depositions transcripts being transferred from Rovak to Atlee, and language with respect to an option to purchase the real estate and the valuation of that property. In addition, a number of other changes were made to the Rovak Agreement, all at Atlee's request.

Yet of greater significance is terminology from the Ward Agreement *not* incorporated into the Rovak Agreement.

During the negotiations on the 30th, Atlee removed two pages from a copy of the Ward Agreement, and placed brackets around certain language which made a detailed statement to the effect that while the lease to be executed was substantially similar to the Lipman Lease, under the lease to be executed by the parties, the monthly rental was to be "net" to Sherman. This was further detailed by stating that MSI would be responsible for all taxes, maintenance and insurance, as well as certain other expenses, with respect to the leased premises. The language further stated that if there was any discrepancy between the Lipman Lease and the language Atlee sought to include in the Rovak Agreement, the cited language would control over that contained in the Lipman Lease.

Rovak took these two pages, along with certain other wording from the Ward Agreement, and discussed them with his client. Upon returning, Rovak told Atlee that while most of the portions of the Ward Agreement which Atlee wanted to include in the Rovak Agreement were acceptable to MSI, the terminology with respect to the lease was not. Rovak told Atlee that the description of the rent as "net" was unac-

ceptable, and that MSI would not utilize any definition of "net" to describe which party was responsible for what expense. Instead, Rovak stated that in view of Sherman's insistence, both on and off the stand, upon the acceptability of the Lipman Lease, MSI would be willing to accept the Lipman Lease with its terms unchanged, such that the lease to be executed by the parties would be the Lipman Lease changed only as to the period of the lease, the rental itself, the description of the property, an escalation clause and the identity of the lessee and the lessor. Rovak insisted that, other than those changes, the lease between the parties would be identical to the Lipman Lease in all respects. Notes made by Rovak at the time, and which were kept by Atlee until produced at the trial, refer to the Lipman Lease and bear a notation "insert MSI"—a direct and contemporaneous reference to this insistence.

Atlee left Rovak, consulted with Sherman, and thereafter told Rovak that these terms were agreeable to Sherman.

As announced in open court, and on the record, the settlement contained the following term:

"MSI will lease the real estate now leased to the Pharmacy (the "Real Estate"), being not less than all of the real estate known and numbered as 1170 Perkiomen Avenue, for a period of ten years, with an option to renew for an additional ten years at the end of the first term. The monthly rent under such lease will be in the amount of $750, such amount to be adjusted at two and one-half year intervals, in accordance with changes in the Consumer Price Index (U.S. Average Items). It is contemplated that the parties will execute a formal lease, the other terms of which lease to be identical to the terms of the [Lipman Lease].

Elsewhere in the agreement, Sherman specifically covenanted to deliver to MSI a lease of the premises on these terms.

Shortly after the 30th of September, a second written purchase agreement was prepared and executed by all parties (the

"Final Purchase Agreement"). That Agreement contained the language referred to above and included the language obligating Sherman to deliver the lease as specified to MSI.

In October, 1983, Rovak sent the lease which was required under the terms of the Final Purchase Agreement to one of Sherman's attorneys, Dennis Ward. Ward concedes that the lease sent by Rovak is the lease described in the Final Purchase Agreement.

Nonetheless, on receipt of that lease, Ward called Rovak and alleged that there had been an error, and the paragraph of the lease which provided that the lessee pay only 16.77% of the taxes on the leased property, with a cap of $1,000, should have provided that the lessee pay all of the taxes. During these discussions, as well as at trial, Ward conceded that the provisions of the lease sent by Rovak were in fact identical to those of the Lipman Lease but insisted that his clients had made a mistake, as they intended to agree to a lease wherein the lessee was responsible for all taxes.

Thereafter, the parties "agreed to disagree" on paragraph 17 of the lease and closed the transaction insofar as possible. In the meantime, both prior to trial and on the witness stand, Ward has agreed that the other documents prepared by Rovak, including, *inter alia,* a promissory note, security agreement, consent to assignment of lease, are satisfactory to Sherman.

### III.

### THE DOCUMENTS ON THEIR FACE

Sherman's allegations that the Final Purchase Agreement does not reflect the agreement of the parties are rejected. The Final Purchase Agreement was read in open court in the presence of William T. Sherman, Thomas Frontz, and Steven White, as well as their counsel, and later executed by them. Their assent to that Agreement was reached with full knowledge of all relevant facts and with the advice of counsel. In particular, after it was read in court, counsel for MSI and the Court itself ascertained that the Final Purchase Agreement was satisfactory to Sherman and that it accurately stated the agreement which was reached at the time.

This Court finds that the terms of the Final Purchase Agreement with respect to the lease are clear, unambiguous and not susceptible of more than one interpretation. Indeed, Sherman does not contest the clarity of the contract, or the meaning of its words. In the normal situation, this would mean that there is no reason to consider extrinsic evidence to determine the meaning and effect of the Final Purchase Agreement. *Mellon Bank, N.A. v. Aetna Business Credit,* 619 F.2d 1001 (3d Cir.1980). Thus, given this situation, the sole question left for decision by this Court is Sherman's allegations of a "unilateral mistake of fact" coupled with MSI's alleged knowledge of that mistake on the other.

### IV.

### THE ALLEGATIONS OF UNILATERAL MISTAKE

At trial, and in various pleadings filed herein, Sherman conceded that the Final Purchase Agreement accurately reflected the agreement announced to the Court on September 30, and that the lease prepared by Rovak is the lease called for in that agreement. Instead, Sherman alleges that when they agreed to the terms of the Final Purchase Agreement and executed the same, they were laboring under a misconception of fact. According to the pleadings filed by Sherman, that misconception of fact consisted of the belief that the Lipman Lease, was a "net" lease, such that the tenant pays all taxes on the leased property. Sherman's witnesses were somewhat confused as to whether this also meant that the tenant was to pay all maintenance and insurance costs as well. In point of fact, the Lipman Lease is not net of taxes, nor net of maintenance or insurance costs.

As a threshold matter, the court notes that Sherman and Sherman's counsel conceded that at the time they entered into

the settlement, they were well aware of the precise terms of the Lipman Lease. In fact, they testified that at all relevant times they knew the Lipman Lease was not fully net of taxes, not net of maintenance, and not net of all insurance expenses. However, based upon their own interpretation of that lease, and in spite of MSI's refusal to utilize the "net" formula agreement, Sherman decided that a lease identical to the Lipman Lease, except for the specified changes, was acceptable. In short, as Mr. Ward testified, the alleged "mistake" was in thinking that the terminology of the Lipman Lease, when applied to the Reading property, would result in MSI's paying all of the taxes. Given all parties' knowledge of the precise terms of Lipman Lease, that mistake is one of law, not one of fact. Because equity will generally not relieve a party of a mistake of law, the matter should be ended on that note. See generally 27 Am.Jur.2d, Equity, §§ 36, 39. Assuming that Sherman's motion seeks rescission of only a *portion* of the settlement it is axiomatic that there is no such thing as a partial rescission. Assuming that he alleges a unilateral mistake that, too, will not afford the basis for reformation of a contract.

Notwithstanding, the Court, in fairness to the parties, has looked beyond these legal infirmities to the factual basis of the dispute and has carefully considered the testimony and evidence adduced.

At trial, William Sherman, Thomas Frontz and, to a lesser extent, Steven White, initially testified that they agreed to the Final Purchase Agreement and, in particular, its language with respect to the lease in the belief that the Lipman Lease was a "net" lease, meaning that the lessee was responsible for all expenses in connection with the premises. The most important of these items are taxes, maintenance and insurance. The problem with this position is that the same individuals, as well as their attorneys, testified that they were well aware of the fact that, under the Lipman Lease, lessee paid only 16.77%, and in no event more than $1000, of the taxes on the property described in that lease, that

maintenance expenses on the building's exterior was borne by the landlord, and that the insurance coverage required of the lessee was also capped.

At the time of the negotiations, as well as the announcement of the settlement to the Court, Sherman was in possession of the Lipman Lease and was fully aware of its terms. Indeed, Mr. William Sherman and Thomas Frontz had recently renegotiated that lease, and a copy of it is attached to the Ward Agreement, from which Mr. Atlee was extracting various terms. More to the point, William Sherman, Thomas Frontz and Dennis Ward specifically stated that they were aware of the terms of the Lipman Lease limiting the payment of taxes by the Lessee, limiting the amount of insurance to be carried by the Lessee, and limiting the maintenance responsibility of the Lessee. They even conceded that the Lipman Lease is not a "net" lease, as they understand the term. They further admitted that they were aware of these matters prior to and at the time their second settlement was reached. That this is obvious is easily seen from the Ward Agreement, and Mr. Ward's testimony about it. In preparing that document, Ward incorporated the Lipman Lease, but modified it so that it *would* be net of taxes. The Ward Agreement was carefully reviewed by Sherman, then signed by them. The court notes that the Lipman Lease is not merely referred to in the Ward Agreement; it is physically attached to it.

In any event, it was these very modifications to the Lipman Lease that Rovak rejected. He specifically advised Atlee (as Atlee conceded at trial), of that rejection, and further that MSI would not accept the definition of "net" lease sought by Sherman. Finally, he told Atlee that a lease acceptable to MSI would have to contain terms *identical* to those in the Lipman Lease—no more and no less.

Sherman attempted to explain all of this away by offering evidence that the lessee under the Lipman Lease did not lease the entire tract owned by Lipman, but instead

leased only 16.77% thereof. As a result, the lessee effectively paid all of the taxes attributable to his portion of the property. While the argument is superficially attractive, it is fatally flawed. All of the Sherman witnesses admitted not only an awareness of the percentage limitation referred to above, but of the fixed cap of $1,000 on taxes paid by the lessee, irrespective of any percentage allocation. As taxes on the Reading property exceeded that figure, there could be no doubt but that the Lipman Lease was not net of taxes, nor would it be when applied to the Reading parcel. That Sherman was aware of the cap, as well as its operation and importance, is obvious from the fact that this cap was raised from $1,000 up to $1500.00 when the Lipman Lease was renegotiated, in April of 1983. When this fact was pointed out, Sherman's response was to acknowledge that the lease to be executed by MSI would indeed contain such a cap, but to urge that it would have to be negotiated upward.

This Court is of the opinion that, as Judge Ditter stated in *Gross v. Penn Mutual Life Insurance Company*, 396 F.Supp. 373 (E.D.Pa.1975), when presented with a very similar situation, "it is obvious that plaintiff had a change of heart ..." 396 F.Supp. at 375. Here, Sherman has had not one, but two changes of heart. This conclusion is supported by the Court's hearing of the proceedings over the First Settlement, and its ability to observe and weigh the testimony, as well as the credibility, of Mr. William Sherman, his business associates, and that of the other witnesses. The Court specifically finds that Sherman was, at all relevant times, aware of the terms of the lease agreed upon on September 30, 1983, and not laboring under any mistake of fact.

■ As a result of the foregoing, there is no reason to go beyond the four corners of the executed Final Purchase Agreement. The Final Purchase Agreement refers to a lease having certain terms, and specifically identifies those terms by referring to the Lipman Lease. The parties chose not to refer to the Lipman Lease for the purposes of *form*, but instead, specifically agreed that the *terms* of the lease they agreed to execute would be identical to the terms of the Lipman Lease as amended by the agreement of the parties. The word "identical" is a common word of accepted usage and, therefore, "should be interpreted in accord with [its] accepted usage unless such an interpretation would produce irrational results." *Mellon Bank, supra*, at p. 1013. Indeed, Mr. Atlee correctly defined the word "identical" as "the same as." Here, the result is hardly irrational, as it merely enforces the specific intention of MSI in refusing the Ward Agreement, and its language with respect to the Lease. There being no internal inconsistency in the Final Purchase Agreement with respect to the lease provisions, there is no reason to accept any extrinsic evidence with respect to the interpretation of this contract. *United Refining Co. v. Jenkins*, 410 Pa. 126, 189 A.2d 574, 578 (1963).

■ The history of these proceedings has been one of lengthy arguments over various terms and documents. Sherman distrusted MSI, and therefore carefully reviewed the Final Purchase Agreement before signing it. As experienced businessmen, it is difficult to believe that Sherman made any good faith mistake of fact with reference to the Lipman Lease. In fact Mr. Atlee testified that on the 30th, after explaining MSI's position on the lease to Sherman, Sherman specifically acceded to it. Having had the opportunity to observe the witnesses, and having considered all of the facts and circumstances, this Court does not accept William Sherman's testimony, nor that of his associates, as to an alleged "mistake" any more than this Court believed the testimony given by William T. Sherman on the 29th and 30th of September. Again, this Court specifically finds that William Sherman and his associates, are for the second time, intentionally, and in bad faith, seeking to avoid an agreement made by them, and are therefore here with unclean hands.

■ In fact, even if this court accepted the allegations of "unilateral mistake", all

that would be proved is Sherman's negligence in failing to determine the effect of the Lipman Lease when applied to the Reading property, before agreeing to its terms. That negligence bars any relief from his own "mistake". *Stone v. C.I.T. Corporation,* 122 Pa.Super. 71, 184 A. 674 (1936).

MSI has attempted to resolve this dispute since June of 1983 through its Vice-president, Ronald T. Hofmeister, and its counsel. We find those efforts to have been entirely in good faith, and taken with candor and frankness. This Court specifically finds that MSI was not on notice of any "mistake" by Sherman even if the same did exist, and that MSI negotiated for, and agreed to, the second settlement in good faith. MSI's refusal to rely on anyone's understanding of "net," and its insistence on reaching actual terms and wording of the proposed lease not only demonstrates an honest effort to avoid the very dispute now before the Court, but served to put Sherman on notice of its very clear intentions. If Sherman failed to heed that notice, this Court will not relieve him of his error.

It is obvious to this Court that on the 30th of September, 1983, all parties to these actions reached a full settlement with a complete understanding of its terms, and that the Final Purchase Agreement accurately sets out the terms of that settlement. The lease document proposed by MSI and tendered to Sherman on October 25, 1983, was the lease described in the Final Purchase Agreement and should have been executed by Sherman.

Finally, this Court feels compelled to add that in reaching these conclusions, it has accepted certain testimony, and rejected other testimony. It is painfully aware that its conclusions involve findings of fact inconsistent with the evidence given by some witnesses. Yet the unpleasantness of making a decision on credibility does not mean that the decision is difficult. Here, the Court is left with a profound and deep belief in the correctness of the facts as found by it. Evidence to the contrary has been carefully weighed, yet confidently rejected.

## V.

### THE EFFECT OF THE FINAL PURCHASE AGREEMENT

■ An agreement to settle a lawsuit is binding upon the parties. *Gross v. Penn Mutual Life Insurance Company,* 396 F.Supp. 373 (E.D.Pa.1975), and the many cases cited therein. While the presence of issues as to the formation of the Agreement or its terms may obligate a court to afford the parties a hearing on the issues raised (*Hobbs & Co., Inc. v. American Investors Management,* 576 F.2d 29 (3d Cir.1978)), if no reasonable alternative interpretation to the wording of an agreement is suggested, then the writing will be enforced as the Court reads it on its face. *United Refining, supra.*

■ Nonetheless, Sherman's allegations of "mistake" have been heard, carefully reviewed, and found to be totally without merit.

The above constitutes the Court's Findings of Fact and Conclusions of Law. As a result of these findings and conclusions, an appropriate order shall issue.