795 F.2d 291
 55 USLW 2079
 CHANNEL HOME CENTERS, DIVISION OF GRACE RETAIL CORPORATION, Appellant,
v.
Frank GROSSMAN, Tri Star Associates, Baker Investments
Corporation, Cedarbrook Associates, a Pennsylvania
Limited Partnership, Appellees.
 No. 85-1346.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 7, 1986.
Decided June 30, 1986.
 
 Joel C. Meredith (argued), Bruce K. Cohen, Meredith & Cohen, Philadelphia, Pa., for appellant.
 C. Gary Wynkoop (argued), Blank, Rome, Comisky & McCauley, Philadelphia, Pa., for appellees.
 Sidney Ginsberg, Philadelphia, Pa., for amicus curiae Mr. Good Buys of PA, Inc.
 Before WEIS, HIGGINBOTHAM, BECKER, Circuit Judges.
 OPINION OF THE COURT
 BECKER, Circuit Judge.
 
 
 1
 This diversity case presents the question whether, under Pennsylvania law, a property owner's promise to a prospective tenant, pursuant to a detailed letter of intent, to negotiate in good faith with the prospective tenant and to withdraw the lease premises from the marketplace during the negotiation, can bind the owner for a reasonable period of time where the prospective tenant has expended significant sums of money in connection with the lease negotiations and preparation and where there was evidence that the letter of intent was of significant value to the property owner. We hold that it may. We therefore vacate and reverse the district court's determination that there was no enforceable agreement, and remand the case for trial.
 
 I.
 
 2
 Appellant Channel Home Centers ("Channel"), a division of Grace Retail Corporation, operates retail home improvement stores throughout the Northeastern United States, including Philadelphia and its suburbs. Appellee Frank Grossman, a real estate broker and developer, with his sons Bruce and Jeffrey Grossman, either owns or has a controlling interest in appellees Tri-Star Associates ("Tri-Star"), Baker Investment Corporation ("Baker"), and Cedarbrook Associates, a Pennsylvania Limited Partnership ("Cedarbrook").[1]
 
 
 3
 Between November, 1984 and February, 1985, the Grossmans, through Baker, were in the process of acquiring ownership of Cedarbrook Mall ("the mall") located in Cheltenham Township, Pennsylvania, a northern suburb of Philadelphia. During these months, Baker was the equitable owner of the mall, Tri-Star was acting as the mall's leasing agent, and legal title was in Equitable Life Assurance Society. It was anticipated that, upon closing in February, 1985, Baker would become both legal and equitable owner of the mall. App. at 218a-219a, 496a. The Grossmans intended to revitalize the mall, which had fallen on hard times prior to their acquisition, through an aggressive rehabilitation and leasing program.
 
 
 4
 In the third week of November, 1984, Tri-Star wrote to Richard Perkowski, Director of Real Estate for Channel, informing him of the availability of a store location in Cedarbrook Mall which Tri-Star believed Channel would be interested in leasing. Perkowski expressed some interest, and met the Grossmans on November 28, 1984. After Perkowski was given a tour of the premises, the terms of a lease were discussed. App. at 457a, 496a. Frank Grossman testified that "we discussed various terms, and these terms were, some were loose, some were more or less terms." App. at 364a, 496a-497a.
 
 
 5
 In a memorandum dated December 7, 1984, to S. Charles Tabak, Channel's senior vice-president for general administration, Perkowski outlined the salient lease terms that he had negotiated with the Grossmans. App. at 97a. On or about the same date, Tabak and Leon Burger, President of Channel, visited the mall site with the Grossmans. They indicated that Channel desired to lease the site. App. at 413a-415a. Frank Grossman then requested that Channel execute a letter of intent that, as Grossman put it, could be shown to "other people, banks or whatever." App. at 366a-367a. Tabak testified that the Grossmans wanted to get Channel into the site because it would give the mall four "anchor" stores. App. at 414a. Apparently, Frank Grossman was anxious to get Channel's signature on a letter of intent so that it could be used to help Grossman secure financing for his purchase of the mall. App. at 366a-367a, 497a.
 
 
 6
 On December 11, 1984, in response to Grossman's request, Channel prepared, executed, and submitted a detailed letter of intent setting forth a plethora of lease terms which provided, inter alia, that
 
 
 7
 [t]o induce the Tenant [Channel] to proceed with the leasing of the Store, you [Grossman] will withdraw the Store from the rental market, and only negotiate the above described leasing transaction to completion.
 
 
 8
 Please acknowledge your intent to proceed with the leasing of the store under the above terms, conditions and understanding by signing the enclosed copy of the letter and returning it to the undersigned within ten (10) days from the date hereof.
 
 App. at 31a.[2]
 
 9
 Frank Grossman promptly signed the letter of intent and returned it to Channel. App. at 499a. Grossman contends that Perkowski and Tabak also agreed orally that a draft lease be submitted within thirty (30) days. App. at 331a-332a, 365-366a. Perkowski and Tabak denied telling Grossman that a lease would be forthcoming within 30 days or any finite period of time. App. at 445a, 473a.
 
 
 10
 Thereafter, both parties initiated procedures directed toward satisfaction of lease contingencies. The letter of intent specified that execution of the lease was expressly subject to each of the following: (1) approval by Channel's parent corporation, W.R. Grace & Company ("Grace"), of the essential business terms of the lease; (2) approval by Channel of the status of title for the site; and (3) Channel's obtaining, with Frank Grossman's cooperation, all necessary permits and zoning variances for the erection of Channel's identification signs. App. at 30a; see supra note 2.
 
 
 11
 On December 14, 1984, Channel directed the Grace legal department to prepare a lease for the premises. Channel's real estate committee approved the lease site on December 20, 1984. App. at 472a. Channel planning representatives visited the premises on December 21, 1984, to obtain measurements for architectural alterations, renovations and related construction. App. at 379a. Detailed marketing plans were developed, building plans drafted, delivery schedules were prepared and materials and equipment deemed necessary for the store were purchased. App. at 91a-96a, 99a-135a, 422a-423a, 517a-547a. The Grossmans applied to the Cheltenham Township building and zoning committee for permission to erect commercial signs for Channel and other tenants of the mall. App. at 15a.
 
 
 12
 On January 11, 1985, Frank Shea, Esquire, of the Grace legal department sent to Frank Grossman two copies of a forty-one (41) page draft lease and, in a cover letter, requested copies of several documents to be used as exhibits to the lease. App. at 43a-44a. On January 16, 1985, Frank Shea received the following letter from Bruce Grossman:
 
 Dear Mr. Shea:
 
 13
 As you requested, enclosed please find the following documents:
 
 
 14
 1) A copy of a recent title report for the Cedarbrook Mall (the "Mall"),
 
 
 15
 2) A legal description of the Mall,
 
 3) A site plan of the Mall, and
 
 16
 4) A description of the Landlord's construction.
 
 
 17
 As we discussed, we have commenced work on the Channel location at the Mall and would, therefore, appreciate your assistance in expediting the execution of the Channel lease.
 
 
 18
 I look forward to hearing from you soon.
 
 
 19
 Very truly yours,
 
 BAKER INVESTMENT CORPORATION
 
 20
 /s/
 
 
 21
 Bruce S. Grossman,
 
 Executive Vice President
 
 22
 App. at 16a. On January 21, 1985, Frank Shea received a copy of a letter from Frank Grossman to Richard Perkowski dated January 17, 1985. It provided:
 
 
 23
 At Frank Shea's request, enclosed is a site plan for the Cedarbrook Mall and also a copy of the proposed pylon sign design.
 
 
 24
 We look forward to executing the lease agreement in the very near future. If you have any questions, please feel free to call me.
 
 
 25
 App. at 46a.
 
 
 26
 Bruce Grossman called Shea on January 23, 1985 to discuss the lease. The only item Grossman could recall discussing pertained to the "use" clause in the lease, specifically whether Channel could use the site for warehouse facilities at some future point. App. at 286a-287a, 502a. Apparently, Grossman then related other areas of concern and Shea suggested that a telephone conference be arranged with all parties the following week. App. at 382a, 502a. Grossman agreed. According to Grossman, Shea was supposed to initiate the conference call; however, when the call was not forthcoming, Grossman did not attempt to reach Shea or anyone else at Channel. App. at 389a-390a. Shea understood that the Grossmans were going to discuss the lease among themselves and get back to him. App. at 448a.
 
 
 27
 On or about January 22, 1985, Stephen Erlbaum, Chairman of the Board of Mr. Good Buys of Pennsylvania, Inc. ("Mr. Good Buys"), contacted Frank Grossman. Like Channel, Mr. Good Buys is a corporation engaged in the business of operating retail home improvement centers; it is a major competitor of Channel in the Philadelphia area. App. at 20a-21a. Erlbaum advised Grossman that Mr. Good Buys would be interested in leasing space at Cedarbrook Mall, and sent Grossman printed information about Mr. Good Buys. App. at 202a.
 
 
 28
 On January 24, 1985, construction representatives from Channel met at the mall site to go over building alterations and designs. App. at 287a-288a, 503a. The next day, January 25, 1985, Erlbaum and other representatives from Mr. Good Buys met with the Grossmans and toured Channel's proposed lease location. App. at 503a. When Erlbaum expressed an interest in leasing this site, lease terms were discussed. Id.
 
 
 29
 On February 6, 1985, Frank Grossman notified Channel that "negotiations terminated as of this date" due to Channel's failure to submit a signed and mutually acceptable lease for the mall site within thirty days of the December 11, 1984 letter of intent. App. at 42a. (This was the first and only written evidence of the purported thirty-day time limit. The letter of intent contained no such term. See discussion supra at 8.) On February 7, 1985, Mr. Good Buys and Frank Grossman executed a lease for the Cedarbrook Mall. App. at 147a-196a. Mr. Good Buys agreed to make base-level annual rental payments which were substantially greater than those agreed to by Channel in the December 11, 1984 letter of intent. App. at 147a.[3] Channel's corporate parent, Grace, approved the terms of Channel's proposed lease on February 13, 1985. App. at 443a-444a.
 
 II.
 
 30
 Channel commenced this diversity action, 28 U.S.C. Sec. 1332(a), in the district court for the Eastern District of Pennsylvania on February 15, 1985.[4] Count I of Channel's complaint alleged that appellees' conduct violated the December 11, 1984 letter of intent and constituted a breach of contract; Count II was in the form of a motion for a temporary restraining order ("TRO") and preliminary injunction to restrain appellees from violating the letter of intent by entering into a lease agreement with Mr. Good Buys for the Cedarbrook Mall premises. App. at 4a-8a. In a supporting affidavit, S. Charles Tabak averred that Channel had substantially completed all tasks necessary to meet the opening date contemplated in the letter of intent and that it had made out-of-pocket expenditures to this end in the sum of $25,000. App. at 9a-14a.
 
 
 31
 On February 15, 1985 the district court granted a TRO restraining and enjoining appellees from surrendering or tendering possession of the premises described in the letter of intent to anyone other than Channel pending a determination of Channel's motion for preliminary injunction. App. at 2a. A preliminary injunction hearing was held on February 25, 1985. App. at 2a. At the hearing, which lasted approximately ten minutes,[5] the district court requested that live testimony be limited to matters not covered in depositions. The testimony taken was not fully transcribed. See Brief of Appellant at 3.
 
 
 32
 Thereafter, on March 26, 1985, the district court filed a Memorandum Opinion and Order that consolidated Channel's motion for a preliminary injunction with the trial on the merits. App. at 495a-508a. Fed.R.Civ.P. 65(a)(2). The court's Order denied Channel's motion for preliminary injunction and entered judgment in favor of appellees. Additionally, the Order denied as moot Mr. Good Buy's motion for leave to intervene as a party plaintiff.
 
 
 33
 In its opinion, the district court rejected Channel's arguments that the letter of intent constituted either a valid unilateral or a valid bilateral agreement. The court concluded that the letter of intent (1) did not bind the parties to any obligation; (2) was unenforceable for lack of consideration; and, (3) was insufficient to satisfy the Pennsylvania Statute of Frauds for leases, inasmuch as it contemplated a future negotiation, Pa.Stat.Ann. tit. 68 Sec. 250.202-203 (Purdon's 1965 & Supp.1986).
 
 
 34
 On April 5, 1985, Channel filed a motion for reconsideration, arguing that the district court erred by consolidating its denial of the preliminary injunction with an adjudication on the merits without prior notice to the parties. Channel argued that, because the preliminary injunction hearing had been held only ten days after Channel had filed its complaint, there had been insufficient time to complete discovery. Full evidentiary development, Channel contended, required substantially more discovery by way of interrogatories, document requests, and depositions from other persons and entities including but not limited to Jeffrey Grossman (a principal of appellee's Baker Investment Corp. and Cedarbrook Associates); Toys-R-Us and Jamesway (other anchor stores at Cedarbrook Mall); and Equitable Life Assurance Society (the former legal owner of Cedarbrook Mall which, Channel argued, had committed to permanent financing of the project on the strength of Channel's letter of intent commitment).
 
 
 35
 Upon reconsideration, the district court entered an order on May 7, 1985, affirming its March 26, 1985 judgment, with the proviso that Channel would be permitted to present additional evidence at another hearing if it made a request to do so within fifteen days of the date of the order. App. at 510a-515a. The district court stated that, despite the lack of notice and Channel's averments to the contrary, "it was of the understanding that the parties had agreed to the consolidation." App. at 514a.[6] Channel did not request another evidentiary hearing. This appeal followed.
 
 III.
 
 36
 Channel's first argument on appeal is that the district court consolidated the motion for preliminary injunction with the trial on the merits without giving timely notice to the parties. Channel further argues that the district court's post-judgment offer to permit the introduction of further evidence did not remedy its error. While we consider this to be a close question, and strongly disapprove of the procedure utilized by the district court, we cannot reverse on this issue.
 
 
 37
 It is generally inappropriate for the district court to grant final judgment on the merits at the preliminary-injunction stage. University of Texas v. Camenisch, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); see 7 J. Moore, J. Lucas & K. Sinclair, Jr., Moore's Federal Practice p 65.04 (2d ed. 1986). However, in the event that an expedited decision on the merits is deemed necessary, Fed.R.Civ.P. 65(a)(2) permits the district court to combine a preliminary injunction hearing with a hearing on the merits provided that the parties "receive clear and unambiguous notice [of the court's intent] to consolidate the trial and the hearing either before the hearing commences or at a time which will still afford the parties a full opportunity to present their respective cases." Camenisch, 451 U.S. at 395, 101 S.Ct. at 1834 (citations omitted); see Fenstermacher v. Philadelphia National Bank, 493 F.2d 333 (3d Cir.1974); DeLeon v. Susquehanna Community School District, 747 F.2d 149, 152 n. 6 (3d Cir.1984).
 
 
 38
 The district court failed to give advance notice of the consolidation and therefore committed error. The court did, however, on reconsideration, give Channel the opportunity for a second hearing at which Channel could present additional evidence on the merits. Channel declined this invitation. At oral argument before this court, Channel explained that it had not seized the opportunity for a second hearing because the district court had not provided for the additional discovery, and Channel felt that the additional hearing would be meaningless without such discovery. The problem with this argument is that Channel did not raise it before the district court; Channel did not ask the court to grant it leave to take discovery or for additional time. Channel thus waived any argument concerning a technical defect under Fed.R.Civ.P. 65(a)(2). Fenstermacher, 493 F.2d at 336-37.
 
 IV.
 
 39
 Channel's second contention on appeal is that the district court erred in holding that the letter of intent was unenforceable and did not bind the parties to any obligation. Channel argues that the letter, coupled with the surrounding circumstances, constitutes a binding agreement to negotiate in good faith. Appellees rejoin that a promise to negotiate in good faith or to use best efforts to reduce to formal writing an agreement between the parties is enforceable only if the parties have in fact reached agreement on the underlying transaction. Because it is conceded that the letter of intent did not constitute a final agreement between the parties, appellees contend that it is merely evidence of preliminary negotiations and, as such, is unenforceable at law. Appellees further argue that even if the agreement were an otherwise enforceable contract, the letter of intent and any promises contained therein are unenforceable by virtue of Channel's lack of consideration. The parties agree that Pennsylvania law applies to the case.
 
 
 40
 It is hornbook law that evidence of preliminary negotiations or an agreement to enter into a binding contract in the future does not alone constitute a contract. See Goldman v. McShain, 432 Pa. 61, 68, 247 A.2d 455, 458 (1968); Lombardo v. Gasparini Excavating Co., 385 Pa. 388, 392, 123 A.2d 663, 666 (1956); Kazanjian v. New England Petroleum Corp., 332 Pa.Super. 1, 7, 480 A.2d 1153, 1157 (1984); see Restatement (Second) of Contracts Sec. 26 (1979). Appellees believe that this doctrine settles this case, but, in so arguing, appellees misconstrue Channel's contract claim. Channel does not contend that the letter of intent is binding as a lease or an agreement to enter into a lease. Rather, it is Channel's position that this document is enforceable as a mutually binding obligation to negotiate in good faith.[7] By unilaterally terminating negotiations with Channel and precipitously entering into a lease agreement with Mr. Good Buys, Channel argues, Grossman acted in bad faith and breached his promise to "withdraw the Store from the rental market and only negotiate the above-described leasing transaction to completion." See supra note 2.
 
 
 41
 Under Pennsylvania law, the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced. Lombardo v. Gasparini Excavating Co., 385 Pa. 388, 393, 123 A.2d 663, 666; Linnet v. Hitchcock, 324 Pa.Super. 209, 214, 471 A.2d 537, 540. Additionally, of course, there must be consideration on both sides. Stelmack v. Glen Alden Coal Co., 339 Pa. 410, 14 A.2d 127 (1940); Cardamone v. University of Pittsburgh, 253 Pa.Super. 65, 384 A.2d 1228 (1978). Consideration "confers a benefit upon the promisor or causes a detriment to the promisee and must be an act, forbearance or return promise bargained for and given in exchange for the original promise." Curry v. Estate of Thompson, 332 Pa.Super. 364, 371, 481 A.2d 658, 661 (1984).
 
 
 42
 Although no Pennsylvania court has considered whether an agreement to negotiate in good faith may meet these conditions, the jurisdictions that have considered the issue have held that such an agreement, if otherwise meeting the requisites of a contract, is an enforceable contract. See, e.g., Thompson v. Liquichimica of America, Inc., 481 F.Supp. 365, 366 (E.D.N.Y.1979); ("Unlike an agreement to agree, which does not constitute a closed proposition, an agreement to use best efforts [or to negotiate in good faith] is a closed proposition, discrete and actionable."); accord Reprosystem, B.V. v. SCM Corp., 727 F.2d 257, 264 (2d Cir.1984); Chase v. Consolidated Foods Corp., 744 F.2d 566, 571 (7th Cir.1984); Arnold Palmer Golf Co. v. Fuqua Industries Inc., 541 F.2d 584 (6th Cir.1976); Itek Corp. v. Chicago Aerial Industries, Inc., 248 A.2d 625 (Del.1968); Restatement (Second) of Contracts Sec. 205 comment (c) (1979) ("Good faith in negotiation"); see generally Kessler and Fine, Culpa in Contrahendo', Bargaining in Good Faith, and Freedom of Contract; a Comparative Study, 77 Harv.L.Rev. 401 (1964).[8] We are satisfied that Pennsylvania would follow this rule. Applying Pennsylvania law, then, we must ask (1) whether both parties manifested an intention to be bound by the agreement; (2) whether the terms of the agreement are sufficiently definite to be enforced; and (3) whether there was consideration.
 
 
 43
 In determining the parties' intentions concerning the letter of intent, we must examine the entire document and the relevant circumstances surrounding its adoption. United Refining Co. v. Jenkins, 410 Pa. 126, 137, 189 A.2d 574, 580 (1963); Hillbrook Apartments, Inc. v. Nyce Crete Co., 237 Pa.Super. 565, 572, 352 A.2d 148, 151 (1975). The letter of intent, signed by both parties, provides that "[t]o induce the Tenant [Channel] to proceed with the leasing of the Store, you [Grossman] will withdraw the Store from the rental market, and only negotiate the above described leasing transaction to completion." See supra note 2. The agreement thus contains an unequivocal promise by Grossman to withdraw the store from the rental market and to negotiate the proposed leasing transaction with Channel to completion.
 
 
 44
 Evidence of record supports the proposition that the parties intended this promise to be binding. After the letter of intent was executed, both Channel and the Grossmans initiated procedures directed toward satisfaction of lease contingencies. Channel directed its parent corporation to prepare a draft lease; Channel planning representatives visited the lease premises to obtain measurements for architectural alterations, renovations, and related construction. Channel developed extensive marketing plans; delivery schedules were prepared and material and equipment deemed necessary for the store were purchased. The Grossmans applied to the township zoning committee for permission to erect Channel signs at various locations on the mall property. Channel submitted a draft lease on January 11, 1985, and the parties, through correspondence and telephone conversations and on-site visits, exhibited an intent to move toward a lease as late as January 23, 1985. See discussion supra at 294-96. Accordingly, the letter of intent and the circumstances surrounding its adoption both support a finding that the parties intended to be bound by an agreement to negotiate in good faith.
 
 
 45
 We also believe that Grossman's promise to "withdraw the Store from the rental market and only negotiate the above described leasing transaction to completion," viewed in the context of the detailed letter of intent (which covers most significant lease terms, see supra n. 2), is sufficiently definite to be specifically enforced, provided that Channel submitted sufficient legal consideration in return.
 
 
 46
 Appellees argue that "[n]o money or thing of value was paid, either at the time of the letter or at any other time that would convert an agreement to negotiate into some enforceable type of contract." Brief of Appellees at 16. We disagree. It seems clear that the execution and tender of the letter of intent by Channel was of substantial value to Frank Grossman. At the time the letter of intent was executed, Grossman was in the process of obtaining financing for his purchase of the mall. When it became apparent to Grossman that Channel--a major corporate tenant--was seriously interested in leasing the mall site, he requested that Channel sign a letter of intent which, as Grossman put it, could be shown to "other people, banks or whatever with a view to getting permanent financing." App. at 366a-367a. Fully aware of Grossman's desire to obtain financing, Channel sought to solidify its bargaining position by requesting that Grossman also sign the letter of intent and promise to "withdraw the store from the rental market and only negotiate the above-described leasing transaction to completion." There being evidence that value passed from each party to the other, we conclude that the record would support a finding that Channel's execution and tender of the letter of intent conferred a bargained for benefit on Grossman which was valid consideration for Grossman's return promise to negotiate in good faith.
 
 V.
 
 47
 In sum, we agree with Channel that the record contains evidence that supports a finding that the parties intended to enter into a binding agreement to negotiate in good faith. We further hold that the agreement had sufficient specificity to make it an enforceable contract if the parties so intended, and that consideration passed between the parties. We will therefore remand this case to the district court for trial.
 
 
 48
 At least two significant issues must be resolved at trial. First, although our review of the record reveals that there is sufficient evidence to support a finding that the parties intended to be bound by the letter of intent, we do not hold that the evidence requires this conclusion. At trial, evidence will presumably be brought to light that will aid the trier of fact in deciding this issue.[9]
 
 
 49
 As noted above, there is also some dispute over whether there was a time limit on the negotiations that was not specified in the letter of intent. Because the district court erroneously concluded that the letter of intent was unenforceable as a matter of law, it made no factual findings with regard to this critical term. If, as appellees suggest, Channel orally agreed to forward a draft lease within 30 days of the date on which the letter of intent was executed, Channel's failure to do so could have terminated the agreement. Alternatively, if, as Channel argues, the parties did not fix a definite time for the duration of negotiations, then a reasonable time would be applicable. See Darlington v. General Electric Corp., 350 Pa.Super. 183, 192-93, 504 A.2d 306, 310-11 (1986), and a determination must be made as to what constitutes a reasonable time under all the circumstances.[10]
 
 
 50
 The judgment of the district court will therefore be reversed, and the case remanded for further proceedings consistent with this opinion.
 
 
 
 [1]
 Tri-Star Associates is a fictitious name under which Frank Grossman trades; Baker Investment Corporation is a corporation whose sole shareholders are Frank Grossman and his sons Bruce and Jeffrey; Cedarbrook Associates is a Pennsylvania limited partnership whose general partner is Baker and whose limited partners are Frank, Bruce, and Jeffrey Grossman. App. at 208(a)-212(a)
 
 
 [2]
 The full December 11, 1984 letter, on Channel stationery, reads as follows:
 Dear Mr. Grossman:
 The Channel Home Centers Division of Grace Retail Corporation has approved the leasing of a store at the above described location subject to the terms and conditions of this letter. The purpose of this letter is to express the understanding under which an Agreement of Lease, prepared by Tenant, but in a mutually satisfactory form, is to be executed by the owner of the Shopping Center, as Landlord and Grace Retail Corporation, as Tenant.
 The Landlord will lease to the Tenant the following described Store located in the captioned Shopping Center, all as shown and described on the copy of your leasing brochure attached to this letter and on the following terms:
 
 
 [1]
 Store: Existing 70,400 sq. ft. area designated in the attached leasing brochure as space "1" on lower level of mall beneath Jamesway Department Store, together with use of outdoor area for storage and sales. Such area located in portion of parking lot adjacent to space "1"
 
 
 [2]
 Term & Rent: Term of twenty-five (25) years commencing the date Tenant opens for business during which Tenant will pay Annual Rent in the amounts set forth below plus Percentage Rent of two (2) percent of Gross Sales during each lease year in excess of the Gross Sales Break Point set forth below:
 Gross Sales
Lease Year Annual Rent Break Point
 1- 5 $112,500 $10.0 MM
 6-10 137,500 11.0 MM
 11-15 162,500 12.1 MM
 16-20 187,500 13.3 MM
 20-25 212,500 14.6 MM
 
 
 [3]
 Option Periods: Tenant's right to extend for four (4) option periods of five (5) years each, on the same terms as during the initial term, except that during each exercised option period, the Annual Rent shall be increased once by $25,000 per year, and the Gross Sales Break Point shall be increased by 10% over the sums in effect for the prior 5-year period (i.e. during Lease Years 26-30 of first option period, Annual Rent shall be $237,500 per year and Gross Sales Break Point shall be $16.06 million);
 
 
 [4]
 Real Estate Taxes: Landlord's obligation, Tenant does not make contributions;
 
 
 [5]
 Common Area Maintenance: Landlord's obligation to maintain and repair existing 850 car parking lot in northeast portion of Shopping Center, which will be the Tenant's primary parking area, and other common areas of the Shopping Center; Tenant does not make contributions;
 
 
 [6]
 Landlord's Pre-term Responsibilities: Landlord will deliver Store empty and broom clean including the removal of all partitions, and with HVAC system in working order. The Landlord will submeter and locate the major electric service to the area of the Store, as Channel designates. Landlord will remove the existing escalator and provide escape stairs as per fire code, and will insure that the building is free of any asbestos hazard. The service elevator and two receiving bays on the lower level, will be boxed-out from the Tenant's Store, to serve the upper levels of the Shopping Center
 
 
 [7]
 Maintenance & Repairs: Landlord will maintain repair and replace if necessary the HVAC system, roof and structural and exterior portions of the building. Tenant responsible for building interior and store front and will pay its prorate share of HVAC usage
 Execution of the Agreement of Lease by Landlord and Tenant is specifically subject to each of the following:
 a. Tenant's authority: Approval by Tenant's parent corporation, W.R. Grace & Co., and its Retail Group, of the essential business terms of the Agreement of Lease;
 b. Legal Title: Approval by the Tenant of the status of title for the site, including any access easements.
 c. Sign Contingency: The Tenants obtaining all necessary permits with the Landlords cooperation (including obtaining any sign variances) for the erection of Tenant's identification signs, on two (2) pylons located on Cheltenham Ave. and Easton Ave., respectively, and two building signs on the front of the mall and the front of the Store.
 The Tenant has and will not incur any brokerage fees in connection with this proposed lease. Any expenditure by the Landlord or Tenant prior to execution of the Agreement of Lease shall be at the party's own risk.
 A store opening date during the first half of 1985 is planned. Lease preparation, obtaining the sign permits and approvals described above and delivery of possession of the Store to Tenant would commence immediately and proceed to achieve that estimated opening date. To induce the Tenant to proceed with the leasing of this Store, you will withdraw the Store from the rental market, and only negotiate the above described leasing transaction to completion.
 Please acknowledge your intent to proceed with the leasing of the captioned store under the above terms, conditions and understanding by signing the enclosed copy of this letter and returning it to the undersigned within ten (10) days from the date hereof.
 Very truly yours,
 /s/
 S.C. Tabak
 Senior Vice President
 Channel Home Center Division
 App. at 29a-31a.
 
 
 [3]
 Channel had agreed to rental payments of $112,500 for years 1-5; $137,500 for years 6-10; $162,500 for years 11-15; $187,500 for years 16-20, and $212,500 for years 20-25. Additionally, Channel agreed to pay percentage rent of two (2) percent of gross sales above the following gross sales break points: $10,000,000 for years 1-5; $11,000,000 for years 6-10; $12,100,000 for years 11-15; $13,300,000 for years 16-20, and $14,600,000 for years 20-25. See supra note 3. Mr. Good Buys agreed to rental payments of $249,750 for years 1-5; $360,750 for years 6-10; $388,500 for years 11-15; $416,250 for years 6-20; and $444,000 for years 21-25. App. at 147a. Mr. Good Buys did not have to pay additional percentage rent based on gross sales, however. Id
 
 
 [4]
 Appellant Channel is a Delaware Corporation with its principal place of business in New York. All appellees are citizens of Pennsylvania or are corporations having their principal place of business in Pennsylvania. 28 U.S.C. Sec. 1332(a)(1)(c). The amount in controversy exceeds the sum of $10,000 exclusive of interest and costs
 
 
 [5]
 At oral argument before us, counsel for both parties agreed that this was the length of the hearing
 
 
 [6]
 The district court also rejected Channel's additional contention that the letter of intent should be enforced under the doctrine of promissory estoppel. In light of our disposition on appeal, we need not reach the propriety of the district court's determinations that neither a unilateral contract analysis nor the doctrine of promissory estoppel is applicable to the instant case
 
 
 [7]
 Because Channel does not argue that the letter of intent is enforceable as a lease between the parties, appellees' reliance upon the district court's conclusion that the letter of intent is insufficient to satisfy the Pennsylvania Statute of Frauds for Leases, Pa.Stat.Ann. tit. 68, Secs. 250.202-203 (Purdon 1965 & Supp.1986), is misplaced. The district court therefore erred in holding that the letter of intent was insufficient to satisfy the Statute of Frauds for leases
 
 
 [8]
 Good faith in the bargaining or formation stages of the contracting process is distinguishable from the common law duty to perform in good faith. See Restatement of Contracts (Second) Sec. 205 (1979) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."); Baker v. Lafayette College, 350 Pa.Super. 68, 84, 504 A.2d 247, 255 (1986); Germantown Manufacturing Co. v. Rawlinson, 341 Pa.Super. 42, 60, 491 A.2d 138, 148 (1985); see generally Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv.L.Rev. 369 (1980)
 
 
 [9]
 Under Pennsylvania law, when the record contains conflicting evidence regarding intent, the question of whether the parties formed a completed contract is one for the trier of fact. Field v. Golden Triangle Broadcasting, Inc., 451 Pa. 410, 305 A.2d 689, cert. denied, 414 U.S. 1158, 94 S.Ct. 916, 39 L.Ed.2d 110 (1973); Yellow Run Coal Co. v. Alma-Elly-Y v. Mines, Ltd., 285 Pa.Super. 84, 426 A.2d 1152 (1981). Compare Arnold, 541 F.2d at 584 (where evidence presented a factual issue whether the parties had obligated themselves to prepare a definitive agreement in accordance with a "memorandum of intent," it was error for district court to determine as a matter of law that no contract existed and case remanded for trial); accord Itek, 248 A.2d at 625; see also Melo-Sonics Corp. v. Cropp, 342 F.2d 856 (3d Cir.1965)
 
 
 [10]
 By focusing on two issues, we do not of course foreclose the district court from hearing evidence and making findings on other matters bearing on contract formation. There will now be a full trial. We commend to the district court that it consider granting leave to the parties to conduct additional, though presumably expedited, discovery prior to trial