

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

7-16-1999

# USA Machinery Corp v. CSC LTD

Precedential or Non-Precedential:

Docket 98-3282

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"USA Machinery Corp v. CSC LTD" (1999). *1999 Decisions*. Paper 201.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/201

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed July 16, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-3282

USA MACHINERY CORPORATION,
a Pennsylvania Corporation

v.

CSC, LTD., an Ohio Corporation;
ALGOMA STEEL INC., an Ontario Corporation

USA Machinery Corporation,
        Appellant

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. No. 96-cv-01768)
District Judge: Hon. Alan N. Bloch

Argued February 8, 1999

Before: SLOVITER, ROTH and STAPLETON, Circuit Judges

(Filed July 16, 1999)

        Jarrell D. Wright (Argued)
        Christopher R. Opalinski
        Eckert, Seamans, Cherin & Mellott
        Pittsburgh, PA 15219

         Attorneys for Appellant

        Craig W. Jones (Argued)
        Reed, Smith, Shaw & McClay
        Pittsburgh, PA 15219

         Attorney for Appellee
         CSC, Ltd., an Ohio Corporation

          Michael J. Betts (Argued)
          Renee A. Metal
          Betts Law Offices
          Pittsburgh, PA 15238

           Attorneys for Appellee
           Algoma Steel Inc., an Ontario
           Corporation

OPINION OF THE COURT

SLOVITER, Circuit Judge.

I.

USA Machinery Corporation ("USA") appeals the District Court's order granting judgment as a matter of law in favor of CSC, Ltd. ("CSC") and Algoma Steel, Inc. ("Algoma"). USA's seven-count complaint raised claims of breach of contract, tortious interference with contract, unjust enrichment, promissory estoppel, and fraud. On appeal, USA presses only the claims asserted in the first, second, and fifth counts of its complaint: those alleging breach of contract and unjust enrichment on the part of both defendants.

This case arises from the efforts of USA, and in particular its president, Robert Hughes, to act as a broker for the sale of an assemblage of steel-making equipment, a "continuous caster,"1 from Algoma to CSC. When Algoma sold the equipment to CSC directly, USA sued the two companies in the United States District Court for the Western District of

_____

1. Hughes described a caster as follows:

       [I]t includes a multitude of pieces of equipment and it includes nine
       bridge cranes, nine ladles, transfer cars, ladle met[sic] station, and
       the caster. All of that equipment is several hundred tons. It would
       probably take up, my guess would be, two or three times this room
       size of boxes of equipment, and that's not saying how big it would
       be after it is assembled.

App. at 81.

Pennsylvania. Trial commenced on April 13, 1998. At the close of plaintiff's case, the District Court, on defendants' motions under Federal Rule of Civil Procedure 50, ruled from the bench that USA failed to present sufficient evidence to reach the jury on its claims of breach of contract and unjust enrichment, and entered judgment as a matter of law. For the following reasons, we will affirm.

II.

Counts one and two of the complaint, the breach of contract claims against Algoma and CSC, allege that USA had contracts with each defendant, which defendants breached by dealing directly with each other rather than through USA. Specifically, USA alleges in count one that "CSC and USA Machinery entered into a contract under which CSC was obligated to deal with Algoma exclusively through USA Machinery and was obligated to pay to USA a finder's fee upon closure of the CSC-Algoma transaction." App. at 15. Similarly, with respect to Algoma, count two states that "Algoma and USA Machinery entered into a contract under which Algoma was obligated to deal with CSC exclusively through USA Machinery and was obligated to pay USA Machinery a finder's fee upon closure of the CSC-Algoma transaction." App. at 16.

USA's unjust enrichment claim is set forth in countfive of the complaint. This count states, in pertinent part:

> USA Machinery supplied information and services to Defendants, and therefore conferred a substantial value and benefit upon Defendants.
>
> At all times relevant hereto, Defendants were aware and acknowledged that USA Machinery was supplying information and services with the expectation of receiving compensation therefor.
>
> USA Machinery has not been paid for its services or for the value and benefit it conferred upon Defendants.
>
> It would be unjust and inequitable for Defendants to retain the value and benefit conferred upon them by USA Machinery without compensation therefor.

3

App. at 18 (allegation numbers omitted).

We review the record in a light most favorable to USA. See Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). At trial, USA rested its case on the testimony of one witness, Hughes, and a number of documents introduced through Hughes's testimony.

Hughes testified that USA is principally in the business of "buying and selling and brokering used steel mill equipment." App. at 80. Some 80% of USA's business consists of brokering sales of steel mill equipment, and 20% consists of selling equipment that USA owns. As Hughes testified, "brokerage" deals were structured either as (1) direct purchases between the buyer and the seller, with all parties having agreed to a fee to be paid to USA, or (2) "spread" transactions whereby USA consummates two transactions simultaneously -- a purchase by USA of the equipment from the seller and a concomitant sale from USA to the buyer, with USA's profit consisting of the difference in price between the two transactions.

Hughes testified as follows regarding the structure of transactions in his business:

> It is customary in our business that no agreement is made until the end. The written agreement is the purchase order. I have been doing it for 30 years, it's never been different. We never enter into binding legal contracts other than the purchase order which says, I agree to purchase the equipment, and we offer -- you know, it depends on the structuring of the deal, but that's the end of the deal. That's when the contract is put down on paper as to exactly the scope of the purchase.

App. at 93.

When he was then asked what was agreed upon at the outset of such deals, Hughes responded:

> What we agree on at the outset of the deal is that when we are brokering equipment, we get the buyer of the equipment to agree that, look, we are here to service you, we are here to find equipment for you, but in return once I find equipment for you, you're going to

4

deal with me and purchase it and you are not going to go around me once I find it for you and try to buy it direct.

From the seller, the seller agrees if I bring him a customer, a customer he does not have, I'm giving him the opportunity to have a sale, he agrees not to deal directly with my customer and have any communication with my customer so I can consummate a deal. That's the agreement we usually have at the end of the deal.

App. at 94.

With respect to the transaction at issue in this case, Hughes testified that on November 25, 1995, he attended a meeting at CSC with Dan Stefano, a representative of CSC, at which Stefano related CSC's intention to construct a new melt shop facility -- a facility for the melting and refining of scrap steel. At the end of the discussion, Stefano stated "that he would be interested in any piece of used equipment that would fit any of the equipment needs that they had for this new project." App. at 130. The following day, Stefano told Hughes that CSC was in need of ladles, and Hughes related that he found some ladles that might be of interest to CSC. On November 28, 1995, Hughes sent Stefano information on the ladles. App. at 279. There was no communication between CSC and USA for approximately five months following this meeting. App. at 133.

In April 1996, Stefano contacted Hughes by telephone and introduced him to Tony Wilson, the director of CSC's plan for expanding its facility. App. at 134. During this conversation, Wilson indicated that CSC was interested in finding used equipment for its expansion project, specifically an electric arc furnace. Id. On April 30, 1996, Hughes forwarded a letter and accompanying information about a furnace of this kind to Wilson. Shortly thereafter, Hughes met with Wilson at CSC's office in Ohio, where the two discussed the arc furnace and the possibility of Hughes finding other equipment for CSC. When Hughes was asked by his counsel whether a caster was referred to in these discussions, Hughes replied that "I am sure it was discussed, but I don't recall right now." App. at 139.

5

On May 17, 1996, Wilson visited USA's office in Pennsylvania; at this meeting Wilson reviewed information that Hughes had on various pieces of equipment, including the arc furnace. App. at 141–42. CSC ultimately never purchased the arc furnace that Hughes had found.

At this time, USA was also doing business with Algoma, from which it had bought used equipment in the past. On June 26, 1996, Hughes went to Algoma's facility in Sault Ste. Marie, Ontario to inspect and finalize its purchase of a "bridge crane trolley" that it later resold in what Hughes described as a "spread" transaction. App. at 145–46. In the course of his visit, Hughes met with Bill Tucker and Paul Logan of Algoma. Logan led Hughes on a tour of the facility during which the two discussed used equipment that Algoma might be willing to sell, and Logan mentioned that Algoma had a caster that was not being used. App. at 147–48. Hughes then met with Tucker again and asked Tucker about the caster. Tucker responded that it was not presently for sale, but when Hughes stated that he had "a customer who may be interested in this caster," Tucker stated that "we would be very interested in any customer that you would have for the caster." App. at 148. No sale price for the caster was discussed at this or any subsequent meeting with Algoma officials. App. at 149.

According to Hughes's testimony on cross-examination, Hughes did not initiate any communication with CSC regarding the Algoma caster after he returned to Pennsylvania following his trip to Algoma's facility. App. at 225–26. According to Hughes's direct testimony, he never discussed with CSC the possibility of an exclusive contract with USA for the purchase or sale of any caster. Nor did he discuss an exclusive arrangement with Algoma whereby USA had the exclusive right to sell Algoma's caster. App. at 159–60.

On July 8, 1996, Al Zalner of CSC called Hughes, explaining that he was now the official charged with the responsibility of overseeing CSC's expansion effort. Zalner, like Wilson, told Hughes that CSC was interested in finding any used equipment that would suit the company's needs. App. at 150. When Hughes asked Zalner if CSC would be interested in finding a used caster, Zalner replied that the

6

company had been searching for one but had given up. App. at 151. Hughes then informed Zalner that he had found one and Zalner asked Hughes to "get me as much information as you can." App. at 151. The conversation then turned to the nine ladles that had been previously discussed. When Zalner asked where the ladles were located, Hughes responded that he "could not divulge the location of the ladles until [he] registered CSC as his customer," when he would be "glad to give [Zalner] the information and location." App. at 153. Hughes testified that Zalner responded by saying "okay." App. at 153. Hughes also testified that he informed Zalner that the manufacturer of the caster was Voest Alpine. App. at 168.

Hughes then called Tucker at Algoma informing him that USA had a customer that was interested in inspecting the ladles. Hughes further stated that he wanted to "register" the customer as USA's customer. Tucker reportedly stated "yes, we accept your registration." App. at 156. When Hughes was pressed by both counsel and the court on the issue of whether the caster was discussed in this conversation, Hughes responded in the affirmative, but gave no indication of the nature of that discussion. App. at 154–55. After this conversation, Hughes wrote to Tucker stating: "As discussed we have a customer interested in purchasing your nine 95 ton ladles. Our customer asked us to divulge the location so that they can make arrangements for an inspection. We now wish to register our customer with you for protection. Our customer is CSC . . . . Should our customer contact you directly or indirectly please ask them to make all inquiries through USA Machinery Corporation." App. at 282. The letter made no mention of the caster. Hughes did not send a comparable letter to CSC.

Hughes then had several conversations with Logan at Algoma in which Hughes requested information about the caster. On July 11, 1996, Hughes sent Zalner at CSC a letter containing information on the caster. The letter described the caster as including a "ladle turret" and possibly "some bridge cranes." There is no mention of ladles being part of the caster unit in the letter. The letter continued: "This equipment is not currently on the market

7

for sale. However, it is possible that an agreement to sell can be reached in the future. If you are interested, I suggest that we inspect the caster and at that time we can discuss some of the parameters of your interest and the owner's future plan." App. at 285.

Hughes testified that "right around" July 11, he had a phone conversation with Zalner in which Hughes informed Zalner that the owner of the caster was Algoma. Zalner responded, "yes, I know that the caster is at Algoma." App. at 168. When Hughes then asked Zalner how he knew, Zalner replied that he had called Voest Alpine, the manufacturer, who informed Zalner of the owner. Hughes then said to Zalner, "you're just operating on my information," to which Zalner replied, "yes, you're right." App. at 168-69. On July 12, Hughes sent Zalner a letter describing the caster and several associated pieces of equipment. The letter also stated that "this equipment is made to be used with the 95 ton ladles we have been discussing." The letter closed stating, "I am looking forward to our site inspection at which time we can discuss the pertinent variables which effects [sic] a project of this size." App. at 286.

From July 12 to July 18, Hughes had several conversations with Zalner in which Zalner repeatedly asked Hughes to get more information about the caster. During this period, Hughes attempted to arrange a site inspection for CSC at Algoma. After receiving a drawing of the caster from Algoma on July 19, Hughes delivered the drawing to Zalner. On July 22, Hughes called Zalner to ask whether he was ready to go to Algoma to inspect the equipment. Zalner responded by telling Hughes that he was going to Algoma on July 24, having already "made arrangements with Algoma." App. at 180-81. In a phone conversation later the same day between Hughes, Zalner, and Tom Fisher of CSC, Hughes complained that CSC was circumventing him. Hughes related the reaction of Zalner and Fisher thus: "Basically they said to me that although I had found the caster for them -- and they freely admitted that I was the one that found the caster -- that if I had a commission due, my problem was to go to Algoma and they had no contract with me . . . ." App. at 181-82.

8

Hughes then called Tucker at Algoma, complaining that Algoma was dealing directly with USA's customer despite the registration letter. According to Hughes, Tucker responded "that it was basically out of his hands." Hughes went on to relate that Tucker told him "[t]hat corporate had made a decision that because my registration letter was not signed by Algoma they felt justified in not honoring. And that although he felt that they were going to give me protection on the ladles that it was corporate's stance that because there was no signature, there was nothing I could do about it and it was my tough luck." App. at 183-84. The following month, on August 23, 1996, Algoma sold the caster and associated equipment, including the ladles, to CSC for $5 million.

As previously noted, the District Court ruled that the evidence presented through Hughes's testimony was not sufficient to create a jury issue either on USA's contract claims or its claims of unjust enrichment, and, accordingly, granted judgment as a matter of law in favor of CSC and Algoma. Our standard of review is plenary; judgment as a matter of law is appropriate only "if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability." Lightning Lube, Inc., 4 F.3d at 1166.

III.

At the outset, we must make two observations. First, although USA's complaint raised numerous causes of action, USA appears only to press its breach of contract and unjust enrichment claims although none of the other causes of action were dismissed prior to trial. During the colloquy after defendants moved for judgment as a matter of law, the court asked USA what theories of recovery it contemplated, and its counsel responded that there were "at least two" and then advanced the contract and unjust enrichment claims. After oral argument, the court granted judgment as a matter of law on all claims against CSC and Algoma; there was no further discussion of any of the other claims alleged in the complaint. App. at 269-276. On appeal, USA presses only its claims of contract and unjust

enrichment. Accordingly, it appears that all other claims were abandoned, and our discussion will be confined to the claims discussed by the parties.

Second, despite the interstate, and indeed international, nature of the putative transactions at issue, the parties have not chosen to address choice-of-law issues. Algoma mentions, in a footnote, that "USA assumes that Pennsylvania substantive law applies in this diversity case, and Algoma agrees." Appellee Algoma's Brief at 16 n.7. Because the parties appear to be in agreement on this issue, we will assume, without deciding, that Pennsylvania law supplies the appropriate substantive rules.

A.

USA argues first that the District Court misapplied the law in ruling that there was no evidence to support a contract between USA and CSC or between USA and Algoma. The parties agree that "the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." ATACS Corp. v. Trans World Communications, Inc., 155 F.3d 659, 665 (3d Cir. 1998) (internal quotation marks omitted). Hence our task in reviewing the District Court's grant of judgment as a matter of law is to examine the record to determine whether the evidence would support a jury's finding that the parties to the two putative contracts expressed their mutual intent to be bound to terms that are sufficiently definite to be enforced.

However, USA offered no evidence that is consistent with the type of contract alleged in the complaint, i.e., that both CSC and Algoma agreed to pay USA a "finder's fee" upon the completion of any transaction. USA has not pointed to, and we have not found in the record, any testimony or documents suggesting such an agreement. In fact, notwithstanding the complaint, USA's brief states that it "did not contend or attempt to prove at trial that the parties had a fully-formed and detailed agreement with regard to the final purchase and sale of the caster and thefinal payment for USA's services." Appellant's Brief at 17. Indeed,

10

Hughes testified that he never had any conversations with Zalner at CSC about a fee for his services, whether connected to the ladles or the caster, App. at 209; that he could not specify whether he expected that he would be paid in the form of a lump sum, a percentage, or a "spread" because "[CSC and Algoma] cut us out of the deal before we got to specifics," App. at 194; and that there was ordinarily no contract until the final consummation of a sale, App. at 93.

We have previously stated in the brokerage context that "a broker cannot recover a commission, even though he brought the seller and buyer together, unless he can prove a contract of employment, express or implied, oral or written, between himself and the buyer (or seller) or an acceptance and ratification of his acts by the buyer (or seller)." Christo v. Ramada Inns, Inc., 609 F.2d 1058, 1061 (3d Cir. 1979) (internal quotation marks omitted). Consequently, there is insufficient evidence in the record, when viewed most favorably toward USA, upon which a jury could reasonably base a conclusion that USA had an agreement with either or both of the defendants under which any sale of equipment from Algoma to CSC would yield a fee for USA.

On appeal, USA advances a different theory for its contract claim: not that there were contracts by which the defendants agreed to pay it a finder's fee but that the agreements between the parties were "in the nature of agreements to negotiate in good faith." Appellant's Brief at 16. Further, USA argues, these agreements involved promises on the part of CSC and Algoma "to deal with one another exclusively through USA and to pay USA a reasonable fee if a transaction was later finalized." Appellant's Brief at 18.

We are unpersuaded. To be sure, we have held, under Pennsylvania law, that an agreement to negotiate in good faith can be enforceable under certain circumstances. See Channel Home Centers, Div. of Grace Retail Corp. v. Grossman, 795 F.2d 291, 298-99 (3d Cir. 1986). However, our holding in that case was predicated on several circumstances that are not present here. In Channel Home Centers, the putative agreement between a commercial

11

property owner and a prospective lessee whereby the owner agreed to withdraw a property from the market during negotiations for a lease was embodied in a "detailed" letter of intent signed by both parties. Id. at 292. We found an "unequivocal promise" in the language of the letter, which stated: "[t]o induce the Tenant [Channel] to proceed with the leasing of the Store, you [Grossman] will withdraw the Store form the rental market, and only negotiate the above described leasing transaction to completion." Id. at 299. Our conclusion that the parties intended to be bound by the letter was supported by the preparation of a draft lease, architectural planning, zoning applications, and correspondence and telephone conversations. Id.

This case, by contrast, does not present similar indicia of intent to be bound, as there is no "detailed" expression of the parties' intent. In the case of CSC, the record shows that Hughes informed Zalner that USA wished to "register" CSC as its customer during a discussion about the nine ladles that Algoma owned, and that Zalner said "okay." App. at 153. There was no discussion of what "registration" entailed, and Hughes acknowledged that he never used the term "exclusive" in his negotiations with CSC. App. at 209. He also acknowledged that USA had never previously consummated a transaction with CSC. Unlike the situation in Channel Home Centers, there were also no extensive preparations. Hughes merely supplied CSC with some information about the caster at CSC's request and discussed with Zalner the possibility of a site inspection. These circumstances do not suggest that the parties had reached the point at which they expressed mutual intent to be bound.

With respect to Algoma, USA offered evidence from which a jury could conclude that in a telephone conversation between Tucker and Hughes Algoma agreed to accept USA's "registration" of CSC as its customer with respect to the nine ladles, an agreement memorialized in a letter from Hughes to Tucker. But there is nothing in the record to suggest that the parties' minds had met on exactly what such registration entailed. Although USA had consummated transactions with Algoma in the past, and had sent Algoma similar registration letters in connection

12

with those transactions, there is nothing in the record from which a jury could reasonably infer that the parties to the prior transactions attached the meaning to those letters that USA urges. These prior letters to Algoma provide an insufficient explanation of the meaning of registration for a jury to infer an agreement to negotiate in good faith of the kind that we found cognizable in Channel Home Centers.

There is insufficient evidence from which a jury could draw a reasonable inference that Algoma, as a result of these prior dealings, understood that registration meant that Algoma agreed to deal exclusively with USA to consummate the transaction at issue.

Nor has USA offered evidence from which a jury could conclude that there was an industry custom that would support the contract claim. When asked on direct examination at what point on "a continuum from expressing an initial interest to find a piece of equipment, sending information, a site visit, then negotiations," a written agreement was entered into, Hughes testified that it was "customary . . . that no agreement is made until the end." App. at 93. He explained that at the outset he would enter into an agreement under which USA would render services in exchange for promises from the buyer and seller that they would not circumvent USA and deal directly with each other. App. at 94. This testimony is insufficient to support a finding that it was understood throughout the industry that the term "registration" involved an agreement of the kind Hughes outlined as his usual practice. In addition, Hughes's own testimony of his conversations with CSC and Algoma do not support a finding that CSC and Algoma would have understood that "registration" involved a legally binding promise to deal exclusively with USA, particularly because Hughes acknowledged that, although he "believed it was understood," he never even used the term "exclusive" in those discussions. App. at 209.

Drawing guidance from our decision in Channel Home Centers, we conclude that this lack of specificity is fatal to USA's contract claims. Hughes failed to offer evidence that any essential term of an agreement to sell the caster was reached; the discussion with Tucker and the letter sent to him only pertain to the nine ladles, not the caster and

13

associated equipment. The fact that the ladles were ultimately sold along with the caster and its associated equipment does not suggest an agreement of the size and scope contended for by USA. And lacking terms for price, delivery, or date, or any other indication that the parties had manifested a mutual intent to bind themselves to a contract of sale, it cannot be said that this agreement was one for the sale of the caster, or even of the ladles.

In sum, we find insufficient evidence in this case of an enforceable agreement either to negotiate in good faith toward the consummation of a sale transaction or to pay Hughes a finder's fee if and when the sale was made.

B.

Arguably, USA's unjust enrichment (quantum meruit) claim in Count 5 is stronger than its contract claim, as a jury might not have been persuaded by the defendants' argument that USA provided no benefit to the parties in connection with the ultimate sale of the caster from Algoma to CSC. We need not decide that issue because USA's unjust enrichment claims (as well as its contract claims) cannot succeed because of its failure of proof with respect to damages. The District Court stated that damages was "the most striking problem" with USA's case. App. at 274. We agree.

To prove damages, USA would have been required to give the factfinder evidence upon which it could base a calculation of damages to a "reasonable certainty." ATACS Corp., 155 F.2d. at 668. "Reasonable certainty" as we have stated, "embraces a rough calculation that is not too speculative, vague or contingent upon some unknown factor." Id. at 669 (internal quotation marks omitted).

USA's evidence does not supply a basis for a calculation of damages that would be anything other than speculative, vague, or contingent within the contemplation of our ATACS opinion. In the first place, there is no evidence from which one might be able to quantify the benefit that USA claims to have bestowed upon the parties. Hughes testified that his transactions generally were structured such that either he negotiated a finder's fee or he would retain as

14

profit the spread between the price the seller was willing to take from USA and the price that the buyer was willing to pay USA.

As noted above, there was no evidence that a finder's fee was negotiated with either of the parties. Nor did USA present evidence from which a jury could find a custom in the industry with respect to appropriate finder's fees. Without evidence that would support a calculation of an appropriate finder's fee, or an estimate of Hughes's services on an hourly basis, a factfinder would be forced to engage in bald conjecture as to the value of USA's services.

Nor could a factfinder determine damages on the basis of a "spread" between the lower limit of what Algoma would have accepted for the caster and the upper limit which CSC would have paid. Because USA, by its own admissions, had not arrived at even an approximation of the price at which Algoma was willing to sell and the price at which CSC was willing to buy, see App. at 268–69, there is no way for a factfinder to determine what, if any, "spread" would result from the transactions.

USA contends that it endeavored to introduce such evidence but was prevented from doing so by the District Court, an issue we review for abuse of discretion. We find USA's contention has no merit. The evidence it sought to introduce was merely Hughes's own testimony regarding how much he anticipated making from the transaction. See App. at 197, 203, 204, 206. The District Court rebuffed these efforts on the ground that the witness's subjective anticipation was irrelevant. We find no abuse of discretion in these rulings.

USA further urges that the District Court erred in refusing to allow Hughes to testify as to what he made in other, unrelated transactions. The District Court sustained objections to this line of questioning as well, stating:

> There has to be some basis for determining one's losses. Either they have to be by agreement or there has to be some standard in the industry. It isn't what he considered to be the basis . . . . I think it is clear that they didn't have an agreement. But it just can't be

15

that he picked out some basis and based his opinion on it.

App. at 198. Insofar as USA's counsel did not lay a foundation adequate to support the fungibility of transactions, we find no abuse of the court's discretion in its unwillingness to admit evidence regarding unrelated transactions. We note in this regard that Hughes had earlier testified, on direct, as follows regarding transactions in his business:

> Q. . . . . Is every deal in your business the same ?
>
> A. No, every deal is different, different structure, depending on the customer and the seller. It can be structured in a multitude of ways.

App. at 99. Hence, we agree with the District Court that USA's proffer of evidence regarding other transactions was insufficiently probative of damages.

Finally, USA urges that it presented evidence of an industry standard sufficient to create a jury issue on damages. We disagree. After the District Court had informed counsel for plaintiff that Hughes would not be allowed to testify as to his anticipated fee for the transaction in the absence of any foundation to support it, and that evidence of an industry standard would be appropriate, the following colloquy with Hughes occurred:

> Q. Are there industry standards in the used steel mill industry that pertain to norms on transactions on a percentage basis?
>
> A. Could you be more specific? I am not sure wha t kind of sale you are referring to.
>
> Q. In connection with the sale of a piece of used steel mill equipment, are there industry norms or standards that you are personally familiar with from your experience in the industry as to appropriate percentage fee figures as a fee for your services?
>
> A. The standard that I'm familiar with is the bott om line.
>
> Q. What is that bottom line figure?

16

A. 20 percent.

Q. Is that the figure you have utilized in the c ourse of your experience over the past 20 years?

A. Yes.

App. at 201.

The import of this testimony was clarified on cross-examination, when, after Hughes reiterated that"we keep a bottom line of 20 percent," the court began questioning Hughes as to what he meant:

THE COURT: What does it mean, you keep a bottom line? Does that mean in every transaction you make at least 20 percent?

THE WITNESS: We start out.

THE COURT: What does "start out" mean? Do you make at least 20 percent on every transaction you do?

THE WITNESS: We start out with a bottom line of 20 percent. After negotiation, it's possible to go below that. But we start with a bottom line of saying, before we quote a price . . . we say, look, this has got to be 20 percent above the asking price of the seller. Then we quote the price. Now it might be 40 percent to start with, but the bottom line is 20 percent because if you can't do it for 10, you lose money.

App. at 235. At this point, counsel for Algoma then resumed questioning. After establishing that USA has made less than ten percent in earlier transactions, counsel asked the following:

Q. So your 20 percent is an internal starting point?

A. Yes.

Q. It's an internal as opposed to some kind of industry standard; it's an internal USA starting point?

A. It's an industry standard because I have talked to all my counterparts and competitors and that's how they view their deals.

Q. That starting point has nothing to do with where ultimately brokers end up in terms of the

17

compensation they receive, correct? It could be higher, it could be lower, it's across the board?

A. Yes, uh-huh.

. . .

Q. . . . . Do you agree that there is no industry standard in determining how much compensation USA receives?

A. Well, if you're asking me, is there a set percentage that I make on every deal, the answer is no. There is no set percentage.

. . .

Q. I am asking, Mr. Hughes, for an industry standard with respect to the amount of compensation USA ultimately receives on any given deal. There is no industry standard is there?

A. No, I would say every deal is different. I have said that in the past. Every deal is different.

App. at 236-37.

In light of this testimony, we conclude that the District Court did not err in holding that there was no evidence upon which a jury could base a finding of damages with the "reasonable certainty" required by our decision in ATACS. Contrary to USA's protestation that there is an industry standard of 20 percent (presumably of the purchase price), its only witness acknowledged that this figure is simply the starting point for negotiations--the goal that USA seeks to accomplish with each deal. The testimony would not support a finding that the industry at large recognizes that 20 percent of the sale price is an appropriate commission in the absence of an agreement.

We therefore agree with the District Court that there was a failure of proof on damages. In light of this conclusion, there is no need to decide whether, if evidence of damages were not lacking, USA satisfied its burden of production with respect to liability for unjust enrichment.

18

IV.

For the foregoing reasons, the judgment of the District Court will be affirmed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

19